Tony **THOMPSON**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 87–424.

District of Columbia Court of Appeals.

Argued June 23, 1988.
Decided Aug. 11, 1988.

---

Leslie B. Holt, Silver Spring, Md., appointed by this court, for appellant.

Kevin A. Forder, Asst. U.S. Atty., with whom Joseph diGenova, U.S. Atty., at the time the brief was filed, and Michael W. Farrell, Helen M. Bollwerk, and Kenneth D. Bynum, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK, FERREN and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

Almost half a century ago, long before *Glasnost* and *Perestroika,* a famous statesman with a gift for words described the Soviet Union as "a riddle wrapped in a mystery inside an enigma."[1] The future prime minister's description of a then inscrutable nation would have been, and would remain today, an apt appraisal of the state of the law pertaining to the admission of proof of "other crimes." When the writer of this opinion first studied evidence more than thirty years ago, he was warned by the authors of his casebook that

> no part of the law of evidence is more consistently and violently litigated than that having to do with the admissibility of proof of other criminal acts.

MORGAN, MAGUIRE & WEINSTEIN, EVIDENCE: CASES and MATERIALS, 380 (4th ed. 1957). A generation has elapsed since then, but those who wrote the current edition of the leading treatise on evidence continue to lament that

> it is hopeless to attempt to reconcile the precedents under the various heads, for too much depends on the tendency of the court in dealing with a flexible principle.

WIGMORE (SECOND) ON EVIDENCE § 307 at 246 (1979). The question when evidence of a particular criminal act may be admitted is so perplexing that the cases sometimes seem as numerous as the sands of the sea and often cannot be reconciled. 2 J. WEINSTEIN, EVIDENCE, § 404(08), at 404-53 (1986). Indeed, Judge Tamm's observations about an equally intractable issue in his concurring opinion in *United States v. Holland,* 144 U.S. App.D.C. 225, 227, 445 F.2d 701,

---

1. Winston Churchill (later Sir Winston Church-   ill), radio broadcast, October 1, 1939.

703 (1971), ring particularly true with respect to other crimes:

> the more cases one reads on constructive possession, the deeper is he plunged into a thicket of subjectivity ... It is illogical to believe that from the chaotic patchwork which flows *ex cathedra* there is created a stable and definable body of law.

It was in this somewhat bewildering context that the trial judge in this case permitted the prosecutor, who by his own account was playing "hardball,"[2] to present evidence of another crime by Tony Thompson, the appellant, as part of his case in chief. In the case now on appeal, twenty-seven tin foils of marijuana laced with P.C.P. were found under the passenger seat, occupied by Thompson, of an automobile operated by his codefendant Bartholomew Copeland. Thompson's defense to the charge of possessing the two unlawful substances with intent to distribute them (PWID) was that the tin foils were not his and that he did not know that they were in the vehicle. Although intent to distribute was not and never became a contested issue, the trial judge admitted, as bearing on the issue of intent, evidence that Thompson had sold P.C.P.-laced marijuana to an undercover police officer on another occasion approximately five months before the incident for which he was on trial. Recognizing that there may be courts that would approve the reception of the evidence in question, we nevertheless conclude that its admission is impermissible in the District of Columbia. Accordingly, we reverse and remand for a new trial.

## I

The facts of this all but paradigmatic case can be stated briefly. Copeland was stopped at about 2:10 a.m. on April 23, 1986 when an officer observed his vehicle weaving from lane to lane in southeast Washington. He was eventually arrested for driving under the influence of alcohol, and in searching him incident to his arrest, officers found eight tin foil packets of P.C.P.-laced marijuana in his jacket pocket. Even after Copeland's removal from the car, the "strong chemical odor" of P.C.P. continued to emanate from the vehicle. Officers directed Thompson, who was occupying the passenger seat, to step out of the car. Directly under his seat, they found a plastic bag containing twenty-seven more tin foils of P.C.P.-laced marijuana.

Copeland and Thompson were both charged with possession of P.C.P. and marijuana with intent to distribute each substance. D.C. Code § 33–541(a) (1987 Supp.). By pretrial motion, the United States sought leave to introduce as *"Drew* evidence"[3] Thompson's sale of P.C.P. and marijuana on November 13, 1985. That incident had occurred within three or four blocks of the scene of the instant arrest, but also within a block and a half of Thompson's home.

The trial judge held a hearing on the government's motion, and the prosecutor argued that evidence of the November 1985 sale should be admitted under several different *Drew* exceptions. Defense counsel objected, relying primarily on *Graves v. United States*, 515 A.2d 1136 (D.C.1986). During the course of the argument, the judge observed that the impact of the contested evidence would be "devastating," but wondered whether the government should be compelled to present a case "that's so sanitized it doesn't bear any [relation] to reality." Attempting to discern whether intent to distribute was in issue, he inquired of the defense attorney. After counsel had apparently misunderstood the judge's question when it was initially asked, (and had uncomprehendingly answered in the affirmative), the following colloquy occurred:

> THE COURT: The issue of intent is contested?
>
> DEFENSE COUNSEL: So far there hasn't been any evidence introduced, Your Honor, by either side.

---

**2.** In fairness to the prosecutor, this remark related to government policy with respect to plea offers rather than to litigation tactics.

**3.** *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

After the conclusion of argument, the trial judge granted the government's motion, ruling that *Graves* was not conclusive and that

> evidence of a prior occasion distributing these substances may be admissible to prove the issue of intent.

The judge also recognized the difficulty of the question:

> if you desire to preserve an appellate issue, right now, the way things are going, it looks like you're going to have one of the first magnitude.

At trial, the prosecutor called police officers who gave evidence with respect to the incidents of November 1985[4] and April 1986 which have been described above. The government's narcotics expert, Detective Lawrence Coates, then testified, among other things, that the packaging of the contraband indicated that it had been broken down into small amounts for ready sale, and was not being retained for personal use. He explained that an individual who wanted to obtain the amount of P.C.P.-laced marijuana contained in the packages could purchase it in large quantities—*i.e.* in "half lids" or "lids"—at a third of its price as packaged.

At the conclusion of Detective Coates' testimony, the prosecutor rested, and each defendant made a motion for judgment of acquittal. Copeland's counsel submitted on the record, but during argument of Thompson's motion, the judge expressed some reservation as to whether there was sufficient evidence, beyond Thompson's mere presence, from which the jury could fairly conclude that Thompson constructively possessed the drugs. Apparently as a result of these problems, the government entered into a plea agreement with Copeland in which felony charges were dismissed in return for Copeland's guilty plea to one count of simple possession of P.C.P. and one count of simple possession of marijuana and his promise to testify truthfully. Over Thompson's strenuous objection, the prosecutor was then permitted to reopen his case, and Copeland testified, among other things, that Thompson had brought the bag with twenty-seven tin foils into the car and had offered to sell Copeland some of them. He further related that Thompson attempted to hide the drugs under the seat when the police stopped the car. Following Copeland's testimony, Thompson renewed his motion for judgment of acquittal, but the trial judge correctly denied it.

Maurice Smart, a friend of Copeland and Thompson who testified for the defense, related that he had spent some of the evening with the two other men, that he had seen Copeland with eight packets of P.C.P.-laced marijuana, but that he had not seen Thompson with any drugs at all. Thompson testified in his own behalf and denied possessing the twenty-seven tin foils, or placing them under the passenger seat, or offering them to Copeland. He claimed that he did not see any drugs, even those in Copeland's possession, until the police searched the car. On cross examination, Thompson was impeached with separate convictions for possession of P.C.P. and possession of marijuana, one of them apparently stemming from the incident that formed the basis for the other crimes evidence in this case. During closing argument,[5] Thompson's counsel attacked Copeland's credibility and focused entirely on the issue whether the government had proved that Thompson possessed the twenty-seven tin foils. With respect to the issue of intent to distribute, counsel conceded that the jury could, but need not, conclude that this had been established by the police expert's testimony and the No-

---

**4.** After the testimony regarding the November 1985 sale, the trial judge instructed the jury that it was being admitted solely for the jury's consideration in determining whether the defendant had the intent to commit the offense for which he was now on trial. *See* District of Columbia Criminal Jury Instruction No. 2.49(a) (3rd ed. 1978). The judge repeated this instruction in his final charge to the jury.

**5.** Thompson cites numerous instances of alleged prosecutorial misconduct during argument to the court and closing argument to the jury, contending in particular that the prosecutor attempted to use the P.C.P. sale in November 1985 as substantive evidence of guilt on the charges before the court. In light of our disposition of the evidentiary issues, however, we need not and do not reach these contentions.

vember 1985 sale, but made no other mention of the issue.[6] The jury found Thompson guilty of possessing both P.C.P. and marijuana with intent to distribute, and this appeal followed.

## II

"It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged." *Drew v. United States, supra,* 118 U.S. App.D.C. at 15, 331 F.2d at 89. (Emphasis in original.) Although the fact that a person committed a crime on another occasion logically tends to show a disposition to commit a similar crime today, and thus perhaps to make it more likely that he committed the offense for which he is on trial, evidence of past misconduct is nevertheless inadmissible to prove his disposition to commit the similar crime, for the tendency of such evidence to prejudice the jury is thought to outweigh its probative value. *Drew,* 118 U.S.App.D.C. at 15 n. 6, 331 F.2d at 89 n. 6; *Boyer v. United States,* 76 U.S.App.D.C. 397, 132 F.2d 12 (1942).

This exclusionary principle, sometimes referred to as the "propensity rule," is of ancient origin. The fundamental role which it has long played in the protection of the rights of the citizen in Anglo-American jurisprudence was recognized early in this century by the New York Court of Appeals in the landmark case of *People v. Molineux,* 168 N.Y. 264, 291, 61 N.E. 286, 293 (1901):

> This rule, so universally recognized and so firmly established in all English-speaking lands, is rooted in that jealous regard for the liberty of the individual which has distinguished our jurispru-

dence from all others, at least from the birth of Magna Carta. It is the product of that same humane and enlightened public spirit which, speaking through our common law, has decreed that every person charged with the commission of a crime shall be protected by the presumption of innocence until he has been proven guilty beyond a reasonable doubt.

It may be prudent to acknowledge that the merit of the rule excluding proof of other crimes to show criminal propensity is neither universally accepted nor self-evident. Courts in non-English speaking countries, perhaps concerned that only a little knowledge (of the defendant) may be a dangerous thing, routinely consider such evidence in determining guilt or innocence.[7] Moreover, at least at first blush, the rule is counter-intuitive. Evidence of other crimes may be relevant on purely logical gounds— an armed robber is, other things being equal, statistically more likely than a law-abiding citizen to commit a second similar crime. As the Supreme Court explained in *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948), "the inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them ...". In the always lucid words of Judge (later Justice) Cardozo in *People v. Zackowitz,* 254 N.Y. 192, 197–198, 172 N.E. 466, 468 (1930):

> the principle back of the exclusion is one, not of logic, but of policy ... There may be cogency in the argument that a quarrelsome defendant is more likely to start a quarrel than one of milder type, a man of dangerous mode of life more likely than a shy recluse. The law is not blind to this, but equally it is not blind to the peril to the innocent if character is accepted as probative of crime. "The natu-

6. Counsel did criticize the expert for not being "cool or dispassionate" when responding to a question as to whether he knew where the drugs were purchased, but did not tie this criticism in any way to the issue of intent to distribute.

7. Foreign courts do so, according to the court in *Molineux,*

> in order that the tribunal which is engaged in the trial of the accused may have the benefit of the light to be derived from a record of his

whole past life, his tendencies, his nature, his associates, his practices, and in fine all the facts which go to make up the life of a human being. This is the method which is pursued in France, and it is claimed that entire justice is more apt to be done where such a course is pursued than where it is omitted.

*People v. Molineux, supra,* 168 N.Y. at 293, 61 N.E. at 294.

ral and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge." WIGMORE, EVIDENCE, vol. 1, § 194, and cases cited. *Accord: Drew, supra,* 118 U.S.App.D.C. at 15–16 n. 8, 331 F.2d at 89–90 n. 8; RICHARDSON ON EVIDENCE, § 175 at 158 (1964).

As a result of this incongruity—it being the logical force of "other crimes evidence" that makes it so prejudicial—courts in this country, which are bound to apply the propensity rule, have been known to remonstrate, if not against the rule itself, then against its proposed application in a particular case, upon the ground that exclusion runs afoul of logic or common sense. *See, e.g., Enriquez v. United States,* 188 F.2d 313, 316 (9th Cir.1951) (prior conviction in drug case probative as to drug charges on trial "as a matter of mere common sense"); *People v. Thau,* 219 N.Y. 39, 42, 113 N.E. 556, 557 (1916) ("a party cannot, by multiplying his crimes, diminish the volume of competent testimony against him"). The propensity rule surely ranks high among the protections derided by a substantial segment of the public as "legal technicalities" which allegedly stand in the way of justice and protect criminals from receiving their just deserts.

That there are logical—and other—arguments against the propensity rule is not conclusive, however. In *United States v. Lotsch,* 102 F.2d 35, 36 (2nd Cir.), *cert. denied,* 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939), Judge Learned Hand observed for the court that a criminal disposition is a convincing factor in the ordinary affairs of life, and that "its exclusion is rather because the issue is practically unmanageable than because it is not rationally relevant." The propensity rule is thought to be justified because the jury may condemn the defendant because of his prior criminal behavior and not because he is guilty of the offense charged. RICHARDSON ON EVIDENCE, § 175, at 158 (1964). It has been suggested that "to tell a jury the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities." *United States v. Daniels,* 248 U.S.App.D. C. 198, 205, 770 F.2d 1111, 1118 (1985). Put another way, other crimes evidence may "result in casting such an atmosphere of aspersion and disrepute about the defendant as to convince the jury that he is a habitual lawbreaker who should be punished and confined for the good of the community." *Pinkney v. United States,* 124 U.S.App.D.C. 209, 211, 363 F.2d 696, 698 (1966). One court has even gone so far as to opine that "once prior convictions are introduced, the trial is for all practical purposes, completed and the guilty outcome follows as a mere formality." *United States v. Burkhart,* 458 F.2d 201, 204 (10th Cir.1972). This is pretty strong stuff, but one need not concur in the most extreme of these statements, *see* p. 425 n. 20, *infra,* to conclude that the danger posed by evidence of prior criminal conduct to the defendant's right to a fair trial is substantial.

Be that as it may, the now well-entrenched propensity rule is thought to be indispensable to the presumption of innocence, *People v. Molineux, supra; United States v. Foskey,* 204 U.S.App.D.C. 245, 251, 636 F.2d 517, 523 (1980); *Government of the Virgin Islands v. Toto,* 529 F.2d 278, 283 (3rd Cir.1976), and the rule therefore has constitutional overtones. McCORMICK ON EVIDENCE, § 190, at 557 n. 1 (1984 ed.). "Once evidence of prior crimes reaches the jury, it is most difficult, if not impossible, to asume continued integrity of the presumption of innocence." *United States v. Daniels,* 248 U.S.App.D.C. 198, 205, 770 F.2d 1111, 1118 (1985). In light of the recognized potential for evidence of other crimes to deny the defendant a fair trial, such evidence is presumptively inadmissible, with the burden on the prosecutor to rebut the presumption, *Drew, supra,* especially in those jurisdictions, including the District of Columbia, which follow an exclusionary approach. *See* J. WEINSTEIN, EVIDENCE, *supra,* at 404–55; discussed at p.

424 n. 18, *infra.* Courts must therefore be alert to sophisticated as well as simple-minded modes of evasion of the propensity rule. *Cf. Lane v. Wilson,* 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939). In general, the rule should not be applied in a parsimonious spirit, and courts must view with a jaundiced eye evidence purportedly offered as relevant to some other issue but in reality bearing wholly or primarily on the defendant's predisposition to commit another similar crime. *See United States v. Coades,* 549 F.2d 1303, 1306 (9th Cir. 1977).[8]

### III

The propensity rule does not, of course, preclude the admission of evidence of other crimes when such evidence is relevant to issues other than the defendant's predisposition to commit the crime. As the court stated in *Drew:*

> Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value.

118 U.S.App.D.C. at 16, 331 F.2d at 90. *Accord: Molineux, supra,* 168 N.Y. at 293–294, 61 N.E. at 294.[9] Where other crimes evidence alleged to be admissible

under one of the *Drew* exceptions has been offered, the trial judge must first determine whether a genuine and material issue has been raised with respect to which such evidence is relevant. If, and only if, he answers this question in the affirmative, the judge must determine, in the careful and informed exercise of his discretion, whether the prejudicial effect of the evidence exceeds its probative value and he must exclude it if it does. *Campbell v. United States,* 450 A.2d 428, 430 (D.C. 1982).

In the present case, the prosecutor initially sought admission of the evidence of the earlier sale by Thompson under several of the *Drew* exceptions. This has been called the "shotgun" approach, *see State v. Bly,* 215 Kan. 168, 176, 523 P.2d 397, 405 (1974), and its use by courts has been criticized as being analytically imprecise. E. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE, § 2:10, ch. 2 at 68 (1984); *Bartley v. United States,* 530 A.2d 692, 698–700 (D.C. 1987) (Mack, J. dissenting). The trial judge, however, admitted the evidence solely on the issue of Thompson's intent, and instructed the jury accordingly.[10] The case therefore turns on whether the intent exception applies.

This court has recognized that the intent exception has the capacity to emasculate the other crimes rule. *Willcher v. United States,* 408 A.2d 67, 76 (D.C.1979). This is so because, in many cases, it is difficult or impossible to differentiate between the intent to do an act and the predisposition to do it. For obvious reasons, therefore, courts must be vigilant to ensure that poisonous predisposition evidence is not

---

**8.** The court stated in *Coades* that, in a trial for bank robbery it was a "deplorable example of prosecutorial overzealousness" to seek to introduce a prior bank robbery conviction to show "intent" when intent was obvious from the circumstances of the crime on trial. The only issue in the case was identification, and the defendant in *Coades,* unlike Thompson in this case, had offered to stipulate that whoever entered the bank intended to rob it. Admission of the evidence was, however, held to be harmless under the circumstances.

**9.** The court in *Drew* pointed out that the recited exceptions are not necessarily exhaustive.

**10.** In light of the testimony by prosecution witnesses that a strong smell of P.C.P. emanated from the automobile, Thompson's prior sale of the substance, and the familiarity with it which can be inferred from the sale, may arguably have been relevant to prove his knowledge that P.C.P. was in the car when he was apprehended in the present case. *Cf. Wright v. United States,* 192 F.2d 595, 597 (9th Cir.1951). Since the jury was not instructed that it might consider the *Drew* evidence as bearing on knowledge, we need not and do not decide whether it was admissible with respect to that issue.

brought before the jury in more attractive wrapping and under a more enticing sobriquet. To cast the issue in Shakespearean terms,

What's in a name? that which we call a rose By any other name would smell as sweet.

*Romeo and Juliet*, Act II, scene 2, line 33. If the prime purpose or effect of the introduction of other crimes evidence is to show that the defendant is a bad man (and, in this case, a drug seller), so infelicitous a project cannot be salvaged by characterizing the venture as being designed to prove his intent to sell drugs rather than his predisposition to do so.

Analysis of recent "intent exception" cases in this jurisdiction and elsewhere reveals that four issues [11] arise with some frequency, and analysis of these issues is helpful in resolving whether evidence of other crimes should be admitted. These issues are:

(1) whether, and to what degree, intent as an issue can be distinguished from predisposition to commit the crime;

(2) whether intent is a genuine, material and important issue, rather than merely a formal one;

(3) whether the trial judge made his decision whether or not to admit the evidence at an appropriate time, when information as to all pertinent factors was available; and

(4) whether the trial judge's instructions to the jury could and did resolve any issue of prejudice.

We address each of these questions in turn, and discuss their application to the present facts in Part IV of this opinion.

A. *Intent as distinguishable from predisposition.*

Intent is an element of virtually every crime. If the "intent exception" warranted admission of evidence of a similar crime simply to prove the intent element of the offense on trial, the exception would swal-

low the rule. In reversing a conviction for possession of heroin with intent to distribute because evidence of prior sales over a lengthy period had been erroneously admitted into evidence, the Maryland Court of Appeals stated:

... [T]he introduction of evidence which shows other offenses by the accused should be subject to rigid scrutiny ... To come within the exception to the rule that evidence of previous offenses is irrelevant, there must appear between the previous offense and that with which the defendant is charged some real connection other than the allegation that the offenses have sprung from the same *disposition*. The exception does not go to the extent of sanctioning the admission of evidence of the "propensity" of the accused to commit crimes similar to that for which he has been indicted.

*Ross v. State*, 276 Md. 664, 671, 350 A.2d 680, 685 (1976). (Emphasis in original.)

In *Ross*, prior sales could only become relevant to the intent with which the defendant possessed heroin on the occasion then under consideration if the court first inferred from the defendant's past conduct the predisposition to repeat it—an inference which the court found impermissible. Where evidence of prior crimes can become probative with respect to intent only after an inference of predisposition has been drawn, the argument for admission is at its weakest, for the distinction between intent and predisposition then becomes ephemeral.

A comparison of *Ross* with *United States v. Payne*, 256 U.S.App.D.C. 358, 805 F.2d 1062 (1986), cited by the government, is instructive. In *Payne*, the court upheld the admission into evidence of guns found in defendant's apartment to show that the drugs also located there were intended for distribution, upon the theory that dealers in narcotics are more likely to use such weapons than are persons possessing unlawful

---

**11.** A fifth issue which is often presented is whether the prosecutor has proved by clear and convincing evidence that the "other crime" was actually committed by the defendant. *See, e.g., Ali v. United States*, 520 A.2d 306, 310 n. 4 (D.C.1987). This problem does not arise in the present case, since the defendant was convicted of the "other crime" following a plea of guilty, and thus committed it beyond a reasonable doubt.

drugs for their personal use.[12] The challenged evidence was thus relevant to the issue of intent to distribute without the court first having to resort to any inference of predisposition. The argument in favor of admission in that type of case is far stronger than in *Ross* or in the present context. *But cf.* the majority and dissenting opinions in *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978) (*en banc*), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

### B. *Intent as a genuine and important issue rather than as merely a formal one.*

Where intent, and especially specific intent, is the central contested issue in the case, the basis for admitting evidence of other crimes bearing on that issue is at its zenith. Where intent is merely a formal issue derived from the elements of the offense, and is not being controverted, the argument for receiving such evidence falters.

A comparison of the situations of the two original defendants in the present case is revealing. Eight tin foil packets were found on Copeland's person, and he was therefore in no realistic position to deny that he was in possession of the contraband. The issue which he could contest (at least more plausibly than Thompson could in light of the testimony regarding the twenty-seven tin foils) was whether the drugs were for personal use or for distribution.[13] Evidence (if the government had any) that Copeland had distributed drugs on other occasions, though prejudicial, would have been relevant to the central issue in his case, and could have logically rebutted his defense.

Thompson, on the other hand, denied possession altogether, and no drugs were found on his person. Under his theory of the case, he could not meaningfully contest intent to distribute. Claiming not even to know that the drugs were in the vehicle, he was in no position to contend that he possessed them for his own personal use. His only plausible position was, in effect, that he did not know to what use the real owner or possessor intended to put them. Although he could have strengthened his hand by stipulating that, so far as he knew, the drugs were intended for distribution by the person to whom they belonged, *see United States v. Coades, supra,* he never retreated from his flat denial of possession, and never controverted intent to distribute.

Other crimes evidence should not be admitted "where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon it." *United States v. Kahaner,* 317 F.2d 459, 471–472 (2d Cir.1963), cert. denied, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963). As a British court put it in a case in which another Thompson was the accused some seventy years ago,

> the mere theory that a plea of not guilty puts everything material in issue is not enough ... The prosecution cannot credit the accused with fancy defenses in order to rebut them at the outset with some damning piece of evidence.

*Thompson v. The King,* [1918] A.C. 221, 222.

When a defendant denies participation in the conduct which is alleged to constitute the crime, intent is ordinarily not a material issue for purposes of admitting other crimes evidence. *United States v. Powell,* 587 F.2d 443, 448 (9th Cir.1978). The materiality of intent as an issue depends, not on the statutory definition of the offense, but on the circumstances of the case and on the nature of the defense. *United States v. Silva,* 580 F.2d 144, 148 (5th Cir.1978) (narcotics distribution case in which defense was mistaken identity; evidence of later sale held inadmissible). Evidence of other misconduct is not admissible to prove intent unless intent is genuinely in issue, not

---

**12.** A weapon on one's person, or for that matter near one's contraband, would appear to be a form of criminal insurance for the success of the venture. *United States v. Moss,* 544 F.2d 954, 960 (8th Cir.1976), cert. denied, 429 U.S. 1077, 97 S.Ct. 822, 50 L.Ed.2d 797 (1977).

**13.** Copeland was permitted to plead guilty to simple possession and never had to admit intent to distribute when he entered his misdemeanor plea.

merely in the sense that it is an element of the offense, but in the sense that it is genuinely controverted. *People v. Golochowicz*, 413 Mich. 298, 316, 319 N.W.2d 518, 524 (1982). *But see Overton v. State*, 78 Nev. 198, 205, 370 P.2d 677, 681 (1962) (plea of not guilty in PWID case puts in issue every material allegation of the charge; prior heroin sale receivable to show guilty knowledge); *United States v. Holman*, 680 F.2d 1340, 1349 (11th Cir. 1982) (plea of not guilty in conspiracy case puts intent in issue; evidence of extrinsic offenses probative as to intent unless defendant "affirmatively takes issue of intent out of case;" counsel's indication that defense would not "actively" contest the issue insufficient).

In those cases in which it has explicitly addressed the question, this court has held that intent must be a material or genuine issue, not merely a formal issue in the sense of entitlement to an instruction.[14] *Graves, supra*, 515 A.2d at 1142; *Willcher, supra*, 408 A.2d at 75–76; *Ali v. United States*, 520 A.2d 306, 310 (D.C.1987). As Judge Gallagher emphasized for the court in *Willcher*, the question whether an issue has been sufficiently raised depends not only on the elements of the offense charged, but also on the defense presented. 408 A.2d at 75. If proof of other crimes were admissible simply because intent must be shown, whether the defendant contests it or not, then such inherently prejudicial evidence would become routinely admissible, without regard to whether the government really needed it. *Graves, supra*, 515 A.2d at 1140.

We adhere to these decisions, and hold that where intent is not controverted in any meaningful sense, evidence of other crimes to prove intent is so prejudicial *per se* that it is inadmissible as a matter of law.

C. *The proper timing of the decision whether to admit other crimes evidence.*

Our holding that the intent exception applies only where intent is a meaningful controverted issue, and that admission of other crimes evidence turns in part on the defense presented, provides a persuasive reason to require trial judges to make the determination to admit or exclude only after they have sufficient information to assess both probative value and prejudicial effect. Accordingly, we make explicit what was at least implicit in this court's prior decisions, and now hold that the decision whether other crimes evidence is admissible under the intent exception should ordinarily be deferred until the trial judge has sufficient knowledge of the government's need for the evidence, and of the defendant's defense, to make an informed judgment.[15] Specifically, in the absence of exceptional circumstances,[16] the govern-

---

**14.** The government has cited a number of cases in which other crimes evidence has been admitted as a part of the prosecution's case in chief to show intent without awaiting a determination whether the defendant would contest it. *See, e.g., Robinson v. United States*, 486 A.2d 727 (D.C.1985), *cert. denied*, 474 U.S. 852, 106 S.Ct. 151, 88 L.Ed.2d 125 (1985); *Page v. United States*, 438 A.2d 195 (D.C.1981). Each of these cases is factually distinguishable; in *Robinson* the defendant's prior assaultive conduct occurred only two or three weeks before the conduct for which defendant was on trial, and in *Page* the evidence in question tended to show *modus operandi*. Moreover, the issue of intent was central to the controversy in each of these cases.

In any event, the question whether the defendant must meaningfully controvert intent before the intent exception can apply was not raised in *Robinson* or *Page*. As the Supreme Court explained in *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925):

Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.

**15.** *Minick v. United States*, 506 A.2d 1115, 1119–20 (D.C.), *cert. denied*, 479 U.S. 836, 107 S.Ct. 133, 93 L.Ed.2d 76 (1986), is not to the contrary. In that case, the evidence of prior misconduct (parole papers) was of critical relevance to the identity of the rapist-murderer, and the defense had previously proffered that the wallet containing these papers had been lost.

**16.** *E.g.*, a defense opening statement, or other comparable indication, that intent is a controverted issue. For a thoughtful analysis of the kinds of situations to which the general rule would not apply, *see United States v. Danzey*, 594 F.2d 905, 910–915 (2d Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

ment may not be permitted to introduce other crimes evidence in its case in chief to prove intent, (including specific intent where the evidence of such intent is sufficient to go to the jury when the prosecution rests, and the defendant so acknowledges). *Graves, supra,* 515 A.2d at 1142; *see also, Willcher, supra,* 408 A.2d at 76; *Pounds v. United States,* 529 A.2d 791, 795 n. 6 (D.C.1987). As explained in *Graves,* 515 A.2d at 1141–42, this approach "has the virtues of faithfulness to *Drew's* basic message and of assuring that other crimes evidence is not admitted until the court is in a position to weigh probative value against prejudice by reference to the defense case."

In so holding, we join what we believe to be the more persuasive authorities on an issue on which the courts are sharply divided. We agree with the writer of a leading treatise that

> when the evidence of another crime is offered with regard to knowledge, intent or the like, it often will be wise to wait until the defendant has sharpened the issue by claiming accident, mistake or involuntariness in his opening statement or presentation of evidence, or by raising special defenses in advance.

McCormick, Evidence, § 190, at 565 (1984 ed.). As Judge Feinberg explained for the court in *United States v. Benedetto,* 571 F.2d 1246, 1248–1249 (2d Cir.1978), the danger that the jury, if told of other crimes at the outset, will impermissibly infer that the defendant is a bad man who probably committed the crime charged, requires that "such strongly prejudicial evidence" should normally await the conclusion of the defendant's case, since the court will then be in the best position to balance the probative worth of, and the government's need for,[17] such testimony against the prejudice to the defendant.

There are cases to the contrary. *See, e.g., United States v. Miller,* 725 F.2d 462, 466 (8th Cir.1984) (where intent is an element of the offense, the government need not await the defendant's denial of intent before offering evidence of similar acts relevant to that issue); *United States v. Webb,* 625 F.2d 709, 710 (5th Cir.1980).[18] We decline to follow these decisions because we believe that the approach described in this opinion fully protects the legitimate interests of the prosecution and at the same time prevents the premature reception of devastatingly prejudicial evidence in cases in which it may subsequently appear that its admission was unnecessary.

### D. *The effectiveness of limiting instructions.*

As we have observed in our earlier discussion, see p. 11, *supra,* the utility of a limiting instruction in the context of other crimes evidence has been widely questioned. The court in *Drew* expressed the view that the likelihood that juries will draw from other crimes evidence an improper inference of criminal predisposition is high. 118 U.S.App.D.C. at 15, 331 F.2d

---

17. An obvious problem would arise if, at the conclusion of the case in chief, the evidence of intent (not including the prior crimes evidence) were insufficient to defeat a motion for judgment of acquittal, or if the defendant so contended to preserve the issue for appeal. The purpose of the rule is to avoid undue prejudice, not to ambush the prosecution. In what we believe would be the relatively unusual situation in which this problem would arise, the trial judge should utilize the procedure suggested in *Graves,* 515 A.2d at 1142, and *United States v. Figueroa,* 618 F.2d 934, 939 n. 1 (2d Cir.1980), or any alternative procedure that ensures fairness to all parties.

18. Rule 404(b) of the Federal Rules of Evidence is viewed as an "inclusionary rule" under which other crimes evidence is admissible except when it tends to prove only criminal disposition. The District of Columbia, like most jurisdictions, follows the exclusionary rule under which the prosecutor has the burden of showing that the evidence falls within one or more of the recognized exceptions. Accordingly, the federal cases which follow a more permissive approach are distinguishable upon that ground. J. Weinstein, Evidence, *supra,* at 404–55; *see also, United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (*en banc*), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); and *United States v. Czarnecki,* 552 F.2d 698, 702 (6th Cir.), *cert. denied,* 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977), both holding that the adoption of Rule 404(b) expanded admissibility of other crimes evidence.

at 89.[19] "The naive assumption that prejudicial effects can be overcome by instructions to the jury ... all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J. concurring). To quote Judge Gewin's memorable articulation in *Dunn v. United States*, 307 F.2d 883, 886 (5th Cir.1962) (in reference to an instruction to the jury to disregard an inflamatory opening statement by the prosecutor):

> one cannot unring a bell; after the thrust of the saber it is difficult to say forget the wound; and finally, if you throw a skunk into the jury box, you can't instruct the jury not to smell it.

Stated more simply, "a drop of ink cannot be removed from a glass of milk." *Government of Virgin Islands v. Toto, supra*, 529 F.2d at 283.

There is empirical support for the proposition that limiting instructions about other crimes are less than uniformly efficacious. One study suggests that when a defendant's criminal record is known and the prosecution's case has contradictions, the defendant's chances of acquittal are 38% compared with 68% otherwise. KALVIN AND ZEISEL, THE AMERICAN JURY, 160 (1966), quoted in MCCORMICK, *supra*, § 190 at 557 n. 6.[20] A scholar who conducted juror interviews in Chicago concluded that jurors were almost universally unable or unwilling to understand or follow the court's instruction to consider prior convictions only for impeachment purposes, and almost invariably used a defendant's record to conclude that he was a bad man and hence more probably guilty of the crime for

which he was standing trial. LEMPERT AND SALTZBURG, A MODERN APPROACH TO EVIDENCE, 220 n. 54 (1982), citing Note, *Other Crimes Evidence at Trial*, 70 YALE L.J. 763 (1961). Accordingly, there is reason for concern that adherence to a limiting instruction in this context may not be easily or universally secured. "It remains an unalterable fact that members of the jury, supposedly of nobler root, will lend excessive weight to a record of misdeed and crime." *Ali v. United States, supra*, 520 A.2d at 310, quoting Slough, *Other Vices, Other Crimes*, 20 KAN.L.REV. 411, 426 (1972).

This approach, can, however, only take us so far. The jury is presumed to follow the trial judge's instructions. *Hairston v. United States*, 497 A.2d 1097, 1102 (D.C. 1985). Moreover, as the prosecutor forcefully argued on appeal in this case, this is a crucial assumption, *Tennessee v. Street*, 471 U.S. 409, 415, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985), for our theory of trial depends on the jury's ability to do so. *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954). Nor is this principle without application to other crimes issues.

■ D.C.Code § 14–305 (1981) requires trial judges in this jurisdiction to allow witnesses who testify, including criminal defendants, to be impeached with convictions of a felony or a misdemeanor which involves dishonesty or false statements.[21] In spite of this court's recognition of serious concerns on the part of judges and scholars that an instruction to consider prior convictions only in connection with the defendant's credibility cannot or will not be fully effective, the constitutionality of

---

**19.** The court, quoting 1 UNDERHILL, CRIMINAL EVIDENCE, § 205 (5th ed. 1956), attributed this partly to the fact that most jurors are untrained in logical thinking and prone to draw illogical inferences, and partly (and perhaps inconsistently) to the fact that it is not "without reason or justification" to apprehend from one's own experience that a person who will commit one crime is very likely subsequently to commit another crime of the same description. 118 U.S.App.D.C. at 15–16 n. 8, 331 F.2d at 89–90 n. 8.

**20.** These statistics, while supportive of the need for judicial vigilance to avoid undue prejudice

to the defendant, appear to demonstrate the exaggerated character of the court's pronouncement in *Burkhart, supra*, that once the jury knows of the defendant's prior crimes, the case is for all practical purposes over and conviction a certainty. Juries are more conscientious and discerning than that.

**21.** This phrase is so broadly construed that most, if not all, misdemeanors not resulting from passion or short temper fall within its reach. *Durant v. United States*, 292 A.2d 157 (D.C.1972), *cert. denied*, 409 U.S. 1127, 93 S.Ct. 946, 35 L.Ed.2d 259 (1973).

§ 14–305 has been repeatedly upheld. *Dixon v. United States*, 287 A.2d 89 (D.C. 1972), *cert. denied*, 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972); *Davis v. United States*, 313 A.2d 884, 885 (D.C.1974); *Hill v. United States*, 434 A.2d 422, 429 (D.C.1981), *cert. denied*, 454 U.S. 1151, 102 S.Ct. 1020, 71 L.Ed.2d 307 (1982). Accordingly, limiting instructions can and in some cases must be provided, and we are constrained to assume that when they contain realistic rather than theoretical distinctions, and when they are clearly and understandably delivered, they will reduce, if not dissipate, the danger of unfairness and prejudice. In weighing probative value against prejudicial effect, courts should inquire as to whether the risk of prejudice has been or can be meaningfully reduced by the trial judge's instructions.

In the course of this analysis, the question arises first whether the distinction propounded in the limiting instruction can make any sense to a jury of lay people. Not all instructions are equal in this regard. A direction to the jury that a prior conviction shall be considered only in connection with the defendant's credibility, and not in relation to his guilt or innocence of the charged offense, is at least readily understood, if not easily followed.[22] An instruction that a defendant's prior drug sale may be considered in connection with his intent to sell drugs on the occasion for which he is on trial, but not as showing his guilt of the current offense in any other way,[23] appears to require a degree of re-

finement which, if theoretically achievable, is probably well beyond the ken of the average juror. .

A second appropriate area of inquiry is whether the limiting instruction has been phrased in terms which a jury is likely to understand. In this connection, we commend our trial court's attention to the substance, though not the form,[24] of the federal trial judge's instruction to the jury in *Enriquez v. United States, supra*, 188 F.2d at 315–316 n. 2. That instruction contained a direction to the jurors that they must first determine, without considering the prior bad act at all, whether the defendant did the act charged. The judge further instructed that if, and only if, the jury finds that the defendant did the acts, then it may consider the prior misconduct, but only in connection with the intent which the defendant did the act for which he is on trial. Although this message may perhaps be read into District of Columbia Jury Instruction 2.49,[25] we think that an explicit direction to the jurors that they must first decide the issue of possession without considering Thompson's earlier sale at all, and only then that they may consider the prior sale as showing intent, would have enhanced in some measure the likelihood that the jury could have and would have used the evidence appropriately.

## IV

■ Applying these considerations to the present case, we conclude that Thompson's conviction must be reversed.

---

**22.** One might well wonder what the man on the Clapham bus (Britain's proverbial reasonable person) or his American counterpart thinks of the proceedings when he is told to consider a defendant's five prior convictions for possession of heroin only in connection with the defendant's truthfulness or lack thereof, but not at all in connection with the defendant's guilt or innocence of the current charge of possession or heroin.

**23.** *See* District of Columbia Criminal Jury Instruction No. 2.49(a) (3d ed. 1978).

**24.** That instruction is replete with the kind of language, (*e.g.,* "the jury may draw therefrom an inference,") which, to put it charitably, ordinary people do not use in the Safeway or on the bus, and which may bring bafflement if not slumber to the jury box. This is the sort of jargon that may account for the popularity of

Dick the Butcher's famous suggestion that "the first thing we do, let's kill all the lawyers." SHAKESPEARE, *HENRY VI, PART II*, Act IV, Scene 2. For many reasonably intelligent jurors who have never had the opportunity to visit Tirana, portions of the instruction in *Enriquez* might as well have been written in Albanian.

**25.** If the jurors in the present case had been questioned by someone studying this subject as to whether they were allowed to, or did, consider the prior sale in connection with the question whether Thompson possessed the twenty-seven tin foils, we are not at all sure that the researcher would have received a unanimous "No!" The chances for a favorable result would, in our view, be far better with a simplified *Enriquez* instruction.

(1) This is a case in which the danger that application of the intent exception would swallow up or emasculate the propensity rule is substantial. There is no real connection between the two offenses other than the allegation that they both spring from the defendant's predisposition to sell marijuana and P.C.P. *Ross v. State, supra,* 276 Md. at 671, 350 A.2d at 685. Indeed, one cannot logically draw a connection between the two incidents without first assuming that, because Thompson was predisposed to sell in November 1985, he remained so predisposed in April 1986. Here, intent piggy-backs on predisposition.

(2) Although Thompson's counsel never stipulated intent out of the case, the nature of the defense was such that intent to distribute never became significant or a contested issue.

(3) The decision to admit the evidence of the prior sale was made, so to speak, before all of the facts were in, and before it became evident that intent to distribute was not really in controversy. Indeed, this case illustrates the utility of deferring such decisions until later in the case, when one need not guess as to what the evidence will be.

As noted in our discussion, at pp. 422–424, *supra,* one factor to be considered in weighing probative value against prejudicial effect is the government's need for the other crimes evidence. In this connection, the testimony of the government's expert witness as to the packaging of the twenty-seven tin foils was persuasive circumstantial evidence of intent to distribute (particularly since Thompson, who denied knowledge of the drugs, was in no position

to contest it), but there was initially no expectation that there would be direct evidence of the proscribed intent. After the trial judge's concern about the sufficiency of proof of constructive possession led the prosecutor to bargain for and secure Copeland's guilty plea and testimony, the government adduced through Copeland direct evidence of Thompson's offer to sell to Copeland. Intent to distribute was demonstrated, if Copeland was to be believed, by Thompson's own words to Copeland as to the use to which the drugs were to be put. The government's need for prejudicial other crimes evidence, if such a need existed previously, was thus further reduced.[26]

Copeland's testimony was one of those unexpected events which so frequently change the course of a trial and which the trial judge could not anticipate at the time that he ruled. If he had deferred decision only until the end of the government's case in chief, he would have had additional relevant information to include in his assessment of probative value and prejudice. By the time the defense case had been completed, the insubstantiality of intent to distribute as an issue had been demonstrated beyond peradventure.

(4) The effectiveness of the limiting instruction given by the trial judge, in the context of the overlap here between intent and predisposition, is very dubious indeed.

\* \* \* \* \* \*

Under the approach which we recommended in *Graves* and *Willcher* and which we formally adopt today, we hold that the evidence of the prior sale was inadmissible as a matter of law.[27] On facts such as

---

**26.** It is, of course, possible that, without evidence of the prior sale, the jury might have rejected the testimony of the government expert, disbelieved Copeland with respect to Thompson's offer to sell, and convicted Thompson only of simple possession. If that had occurred, the prosecutor would have been deprived of an opportunity to present probative evidence on an issue in the case and would have suffered prejudice on that account.

The prospect that this might occur, which appears remote by objective standards, is substantially outweighed by the far greater probability on these facts that Thompson would be prejudiced by the use of the other crime to infer

predisposition or to punish him for what he is rather than for what he did on this occasion. "There should be a point ... at which the prosecutor's need for a safety margin of proof is outweighed by the potentially prejudicial effect of the evidence offered." Note, *Other Crimes Evidence at Trial, supra,* 70 YALE L.J. at 772. That point has been reached, and passed, in this case.

**27.** In the light of the confusion and inconsistency among the cases and the failure of Thompson's counsel to offer to stipulate intent, the trial judge's decision to admit the evidence was understandable.

those here presented, it is not within a trial judge's discretion to rule prematurely, and without adequate information as to the defenses to be presented or as to the government's need, with respect to the admissibility of other crimes evidence. Similarly, a trial judge is without discretion to admit other crimes evidence under the intent exception when intent is not a genuinely controverted issue. The judge did not have occasion to reach the second stage of the prescribed analysis—whether evidence presumptively admissible pursuant to a *Drew* exception should nevertheless be excluded as more prejudicial than probative. When such an issue is fairly presented, then our review is of course limited to abuse of discretion.

## V

■ When Thompson testified and was impeached with his prior convictions, the jury learned anew, at least in part,[28] of his "other crime." This did not, however, render the error harmless. If his prior drug sale had not been revealed in the prosecution's case in chief, Thompson might never have taken the witness stand. Moreover, absent the granting of the government's *Drew* motion, his convictions would have been admitted only for the purpose of considering Thompson's credibility. Admission of the evidence to show intent—here an intent which purportedly continued for or re-emerged after five months—is far more damaging before a jury which makes any serious attempt to comply with the judge's instructions.

Nor can we treat the error as harmless. The trial judge himself characterized the evidence of the prior sale as devastating. The case as to constructive possession was extremely close, especially before the government reopened its case and Copeland testified. Even thereafter, Copeland's credibility was obviously suspect under the circumstances, but evidence of the 1985

transaction tended to corroborate Copeland's testimony that Thompson offered to sell him some of the tin foils, and Copeland's testimony reciprocally reinforced the proof of the prior sale and combined with it to depict Thompson as a bad man who got caught twice five months apart and probably sold drugs more often than that. As this court stated in *Ali v. United States, supra,* 520 A.2d at 316, "it is impossible to say with fair assurance after a careful review of the entire record that the judgment was not substantially swayed as a result. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)."

Marijuana laced with P.C.P. is known as "lovely," or "loveboat," on the streets of our beautiful but drug-plagued capital city. A more accurate characterization would be "ship of doom." Our area's experience with this poisonous mix of illegal substances—a mother decapitates and dismembers her five year old son because she apprehends that he is possessed by demons; a man throws thousands of dollars worth of furniture out of a hotel room because he thinks "God told me to," and later allegedly assaults his father, with death resulting; a man smashes his best friend's head in with a baseball bat, suddenly and for no reason; a defendant dashes from the courtroom during jury selection in our courthouse and leaps over a railing at the escalator, landing near a judge of the Superior Court on the floor below—has identified a problem which is horrifying and, unfortunately, by no means rare. Otherwise nice people do the unspeakable when under the influence of "loveboat." Prosecutors generally do not, and cannot be expected to, play patty cake instead of hardball with those who sell this poison.

The English-speaking world is not the sole repository of judicial wisdom.[29] Per-

---

**28.** Although Thompson had been convicted, in connection with the October 1985 drug sale, of possession of P.C.P. and distribution of marijuana as a result of his guilty plea to each of these misdemeanors, he was impeached only with the

conviction for the possessory crime and not at all with the conviction for distribution.

**29.** Whether it is the innate excellence of our legal system or the innate cocksureness of the people that live under it, so that even as Mr. Podsnap talked to the Frenchman as if he

haps the celestial jury is still out on the question whether the civil law approach described at p. 418, n. 7, *supra* (under which the trier of fact knows something about the defendant), makes more or less sense, from a rational perspective, than our own practice, which requires jurors to assess the conduct of a person about whom they know next to nothing. This court's function is not, however, to choose between the two systems, but rather to apply fairly the law of the District of Columbia. In so doing, we conclude that the admission of the evidence of Thompson's "other crime" violated his rights, and that to hold otherwise would, on these facts, substantially undermine the propensity rule and compromise the presumption of innocence. Accordingly, the judgment is

REVERSED AND THE CASE IS REMANDED FOR A NEW TRIAL.

were a deaf child, we assume that our common-law notions are part of the legal order of nature and are unable to understand that any reasonable being can harbor legal conceptions that run counter to them.

Roscoe Pound, The Spirit of the Common Law at 2 (1921).