Robert L. LANDRUM, Appellant,

v.

UNITED STATES, Appellee.

No. 87–970.

District of Columbia Court of Appeals.

Argued Nov. 10, 1988.
Decided June 20, 1989.

———

Michael J. Dowd, Jr., for appellant.

Kevin A. Forder, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and MACK and TERRY, Associate Judges.

MACK, Associate Judge:

Appellant, Robert L. Landrum, was convicted of armed robbery, D.C.Code §§ 22–2901, 22–3202 (1981), and assault with intent to rob while armed, D.C.Code §§ 22–501, 22–3202 (1981). Landrum contends that his convictions should be overturned because evidence of his participation in a previous robbery was improperly admitted.[1] We agree and reverse.

I.

A.

The charges brought against Landrum arose out of the robbery of a Burger King restaurant located at 3525 Pennsylvania Avenue, S.E. (hereinafter, the D.C. Burger King). Appellant was alleged to have aided and abetted the commission of this robbery by driving the getaway vehicle.

Douglas Naples was among those who testified for the government.[2] He stated that on Sunday morning, March 22, 1987, he had been traveling in a van with the appellant, who was driving the van, and another individual Naples identified as "Gratten," who was in the passenger seat; Naples himself was in the back of the van. At approximately 8 a.m., they pulled into a gas station across from the D.C. Burger King. According to Naples, Landrum said to Gratten that "he liked it, let's do it." They then drove around for a while longer, before arriving back at the Burger King. Once there, the others asked Naples if he wanted anything to eat. Naples testified that when he responded that he did and began to get out of the van, Landrum got "uptight" and told him that "Gratten would get it." Naples then saw Gratten enter the Burger King and, three or four minutes later, come running back. According to Naples, Gratten entered the van on the passenger side, then dove into the back; Naples was told to get into the passenger seat. Naples observed Gratten pull money from his jacket pocket and then hand it to Landrum; he also noticed a gun in Gratten's pocket. Approximately ten minutes later, Naples stated, a police car stopped the van, and the appellant said "We're busted."

Two employees of the D.C. Burger King also testified for the government. They recounted that on Sunday, March 22, 1987, a man entered the restaurant through a side door, pointed a gun, and told them to open the cash register. The gunman then took approximately $225, stuffing the money into his jacket pocket, and ran out of the restaurant. One of the employees saw the robber enter a van, which drove off.[3]

The remaining witnesses who testified about the D.C. robbery were three police officers. Two of these officers related

---

1. Appellant also challenges the trial court's determination that his former codefendant, Gratten Craft, was unavailable to testify for the defense because Craft's intended invocation of the Fifth Amendment would, in the court's view, unfairly limit cross-examination. In light of our disposition of the first issue, we do not reach this contention here.

2. Naples was also arrested in connection with this robbery. In exchange for his testimony, however, he was not indicted.

3. Contrary to the government's theory of the case, this employee testified that the gunman got into the van on the driver's side and that he (the employee) did not see anyone else in the van. This employee also identified the appellant in court as the gunman who had robbed the restaurant. The other Burger King employee, however, testified that the gunman was not in the courtroom.

that, on March 22, 1987, they stopped a green van in response to a radio call concerning a reported robbery. They testified that there were three individuals in the van when they pulled it over, and both officers identified appellant in court as the driver of that van. Approximately $204 was recovered—$40 from the floor on the driver's side, $40 from the driver's jacket pocket, and $124 from the driver's sock. The officers also recovered a gun from the back of the van, where another man, identified as Gratten Craft, had been sitting on top of it. A third officer later retrieved a notebook from the sun visor above the driver's seat. Eight to ten witnesses were brought to the van. The witnesses identified Craft as the gunman in the Burger King robbery,[4] but none were able to identify appellant.

Appellant presented no evidence at trial.

### B.

By pretrial motion, the government also sought to introduce in its case-in-chief evidence of appellant's participation in the robbery of a Burger King in Prince George's County, Maryland on Saturday, March 21, 1987, the day before the robbery of the D.C. Burger King. Over appellant's objection, the trial court ruled this evidence admissible.

In presenting evidence of this previous robbery, the government called four employees of the Maryland Burger King as its first four witnesses at trial. The employees testified that on March 21, 1987, a man entered the restaurant, approached the counter, pulled a gun, and demanded money. The robber was given approximately

$400 from the cash registers. Two of the employees then saw the gunman leave the restaurant and enter a van. In contrast to those employees of the D.C. Burger King who testified, however, one of the Maryland employees was able to identify appellant in court as the driver of that van. Additionally, a handwriting expert testified that an entry in the notebook which was recovered from the van following the D.C. robbery was written in Landrum's handwriting. That entry listed the location of the Maryland Burger King, the date March 21, 1987, and the amount "483"—references, the government argued, to the robbery the day before.

The court allowed in evidence of the Maryland robbery to demonstrate that Landrum possessed the requisite intent for aiding and abetting a robbery.[5] Specifically, the evidence was admitted for the purpose of showing that Landrum's presence at the scene of the robbery was not likely to have been innocent.[6]

## II.

### A.

■ In this jurisdiction, evidence that the accused has committed crimes other than the one with which he is charged is presumptively inadmissible. *Drew v. United States*, 118 U.S. App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964). This is so because of the likelihood that jurors will impermissibly infer that the defendant has a propensity to engage in criminal behavior and so presume guilt. *Campbell v. United States*, 450 A.2d 428, 430 (D.C.1982); *Drew, supra,*

---

**4.** Craft was also indicted for the robbery. He pled guilty prior to trial.

**5.** To aid and abet another in the commission of a crime, one must "knowingly associate[ ] himself in some way with the criminal venture with the intent to commit the crime...." Criminal Jury Instructions for the District of Columbia, No. 4.02 (3d ed.1978).

**6.** At trial, the government characterized the purpose for which the evidence was offered as "absence of mistake"; on appeal, it asserts that

the trial court admitted the evidence both for this purpose and to show intent. As applied to the facts of the present case, we perceive little difference between these two categories. *See Bartley v. United States*, 530 A.2d 692, 703 n. 9 (D.C.1987) (Mack, J., dissenting) (noting that a defense based on mistake or accident is one possible way in which a defendant may contest intent; absence of mistake is thus "inextricably interwoven" with intent). Thus, while we refer to the issue as one of "intent," our analysis would not change were it to be styled "absence of mistake."

118 U.S. App. D.C. at 15, 331 F.2d at 89. Thus we have stated that only where the evidence of the other criminal activity is relevant to prove motive, intent, absence of mistake or accident, a common scheme or plan, or the identity of the perpetrator may such evidence be admitted. *Drew, supra,* 118 U.S. App.D.C. at 16, 331 F.2d at 90. More fully, in order to introduce other crimes evidence, the proponent must demonstrate that 1) the evidence is directed to a contested and material issue in the case; and 2) the evidence is logically relevant to prove this issue independent of its power to demonstrate propensity.[7] *Ali v. United States,* 520 A.2d 306, 310 & n. 4 (D.C.1987); *Graves v. United States,* 515 A.2d 1136, 1140 (D.C.1986); *Campbell, supra,* 450 A.2d at 430; *Willcher v. United States,* 408 A.2d 67, 75 (D.C.1979). Finally, even where the evidence proffered is shown to be logically relevant to a disputed issue, the trial court must still make a separate determination that the probative value of the *Drew* evidence outweighs its prejudicial effect upon the defendant before admitting the evidence. *Thompson v. United States,* 546 A.2d 414, 420 (D.C.1988); *Graves, supra,* 515 A.2d at 1139.

■ Because intent is an element of virtually every crime, if evidence of other criminal activity were routinely allowed in simply to prove the intent element of a crime, the intent "exception" would soon swallow the rule. *Thompson, supra,* 546 A.2d at 421; *Graves, supra,* 515 A.2d at 1140; .*Willcher, supra,* 408 A.2d at 76. Thus, we have stressed that intent must be a genuinely contested matter in the case and not merely a formal issue. *Thompson, supra,* 546 A.2d at 422–23. Moreover, because "[w]hether an issue has been raised

for purposes of receiving other crimes evidence depends upon both the elements of the offense charged and the defense presented," *Willcher, supra,* 408 A.2d at 75, and "because the trial court will usually not be in a position to decide whether the probative value of that evidence outweighs the prejudice to that defendant until the court has heard not only the rest of the government's case but also the defendant's response," *Graves, supra,* 515 A.2d at 1141, we have held, and reiterate today, that, absent exceptional circumstances, the government should not be permitted to introduce other crimes evidence in its case-in-chief to prove intent. *Thompson, supra,* 546 A.2d at 423–24; *see also Graves, supra,* 515 A.2d at 1142–43 (holding prior acts of inviting for prostitution inadmissible in government's case-in-chief); *Willcher, supra,* 408 A.2d at 76 (holding evidence of other crimes admissible where government properly waited until cross-examination to introduce it).

■ This case provides an example of the difficulties which may arise when the determination whether to admit evidence of prior criminal activity is made before all the relevant information is before the court. In this instance, the government asserted in its written "Motion to Admit *Drew* Evidence" and again at an oral hearing immediately prior to trial, that it anticipated that Landrum's defense would be one of innocent presence and that it wished to offer the evidence of appellant's participation in the Maryland robbery in order to counter such a claim. Defense counsel, however, neither confirmed nor denied that this would in fact be Landrum's defense.[8] Nonetheless, the court ruled the evidence admissible—in effect, allowing the govern-

---

7. The enumerated *Drew* exceptions fit within both prongs of this scheme. Certain of the exceptions—*i.e.,* intent and identity—are usually elements of the offense and may be identified, under the first prong, as the material issue to which the other crimes evidence is directed. Other of the exceptions—*i.e.,* motive and common scheme—are not usually themselves elements of the crime, but rather, as required by the second prong, are theories by which the

other crimes evidence may be shown to be logically relevant to the material issue identified. *Bartley, supra,* 530 A.2d at 702 (Mack, J., dissenting).

8. Other defenses were, of course, possible in this case. Landrum might have, for instance, denied that he was even present in the van or at the scene at the time of the robbery.

ment to "rebut" a defense which had not yet, and may never have, been raised.

Subsequently, after the jury had been empanelled but prior to the start of trial, the trial judge realized that the testimony of Gratten Craft, appellant's former codefendant and a potential defense witness, might raise certain Fifth Amendment problems. In addressing the court's concerns, defense counsel proffered that Craft would testify, *inter alia,* that while driving with Landrum in the van, he had decided on his own and on the spur of the moment to rob the D.C. Burger King and that he at no time informed Landrum of this illicit intention. This was the first suggestion by the defense that Landrum might present an innocent presence defense. However, because Craft indicated that he would invoke his Fifth Amendment right not to testify if cross-examined about the as-yet-unprosecuted Maryland robbery, the trial court ruled Craft unavailable to testify.[9] Thus, the one defense witness who might have provided support for this anticipated defense ultimately did not take the stand. Indeed, in the end, the defense presented no evidence, nor made any opening statement. Nevertheless, no reassessment was made of the relevance or probativeness of the other crimes evidence, and the prosecution was permitted to introduce this evidence to commence its case.

We note, finally, the intimate connection between the exclusion of evidence of uncharged criminal activity and the presumption of innocence that forms the basis of our system of justice. *See Thompson, supra,* 546 A.2d at 419; *Graves, supra,* 515 A.2d at 1140; *Campbell, supra,* 450 A.2d at 430; *United States v. Daniels,* 248 U.S. App.D.C. 198, 205, 770 F.2d 1111, 1118 (1985) ("The exclusion of other crimes evidence is not simply a 'technicality' designed to prevent law enforcement personnel from doing their job; it reflects and gives meaning to the central precept of our system of

criminal justice, the presumption of innocence"); *United States v. Myers,* 550 F.2d 1036, 1044 (5th Cir.1977) ("A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is"). In the present situation, where the effect of admission of other crimes evidence was to parade before the jury four witnesses to a previous robbery before the jurors heard or saw a single piece of evidence concerning the crime for which appellant was actually on trial, we cannot help but be concerned that appellant's right to this fundamental presumption was substantially undermined. *Cf. Daniels, supra,* 248 U.S. App.D.C. at 205, 770 F.2d at 1118 ("Once evidence of prior crimes reaches the jury, 'it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence.'" (quoting *Government of the Virgin Islands v. Toto,* 529 F.2d 278, 283 (3d Cir. 1976)).

We therefore hold that the trial court erred in permitting the government to introduce evidence of the appellant's participation in the Maryland robbery in its case-in-chief.

### B.

The more appropriate course for the trial court to have followed would have been to wait until the close of the defense case before making a final determination as to whether the other crimes evidence should have been admitted in the government's rebuttal. At that point, the trial court would have been in the best position to have known whether intent was truly controverted (*i.e.,* whether innocent presence was in fact the defense) and to have weighed the probative value of the evidence against its prejudicial effect.

■ Where the government is concerned that the defense may rest without presenting any evidence (thus eliminating the

---

**9.** Appellant also challenges this ruling on appeal, although we do not reach the issue here.

*See supra* note 1.

**1328**

government's opportunity to present its intent evidence in rebuttal), the prosecution may, at the conclusion of its own case-in-chief reserve the right to re-open its case to seek admission of the other crimes evidence.[10] *Graves, supra,* 515 A.2d at 1142. Regardless of whether the defense presents any evidence, however, the analysis employed in deciding whether or not to admit the *Drew* evidence remains essentially the same: the court must first determine whether intent is a genuine issue in the case; next, it must find that the proffered evidence is logically relevant to prove intent; and, last, even where intent is found to be a disputed issue, and the evidence of uncharged criminal activity found relevant to prove it, the court must find that probativeness of the other crimes evidence exceeds its prejudicial impact. While the first determination, *i.e.,* whether or not intent is genuinely at issue, may be more difficult where the defendant has chosen not to present evidence, and thus the defenses relied upon are less clear, the court may look to the defendant's opening statement, relevant cross-examination, and the representations of defense counsel in resolving this question. Where the nature of the evidence and the actions of the defense make it clear that intent is not being meaningfully controverted, the other crimes evidence must be excluded.[11]

○

## III.

■ We cannot say, under the circumstances of this case, that the trial court's failure to follow these procedures was

harmless error. We do not know whether the trial judge would have admitted the evidence of the Maryland robbery had he waited until all the other evidence was in before making that decision. Nor can we hold as a matter of law that such evidence should have been admitted at that later point. From the record before us, we cannot conclude that the probative value of the other crimes evidence exceeded its prejudicial effect (a judgment which, in any case, is appropriately made in the first instance by the trial judge), nor can we even state with any certainty whether the issue of intent was ever brought into dispute. The defense, as noted, made no opening statement nor put on any evidence. The appellant's motion for judgment of acquittal, moreover, was based on the lack of evidence of identity, not on lack of intent, and defense counsel's cross-examination of the government's witnesses appeared to go largely to identity as well.[12]

To the extent that the admission of the evidence would have been improper at any point, moreover, we are unable to say with fair assurance, given the circumstantial nature of the government's case and the conflicting testimony of the prosecution's witnesses, that the judgment was not substantially swayed by the introduction of the extensive—and more inculpatory—evidence concerning the Maryland robbery.[13] *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

Accordingly, the conviction is reversed and the case remanded for a new trial.

**10.** If the government is allowed to reopen its case, the court should permit the defense to reconsider whether it still wishes to rest its case without introducing evidence. *Graves, supra,* 515 A.2d at 1142.

**11.** A formal stipulation affirmatively removing the issue of intent from the case is not required. *Thompson, supra,* 546 A.2d at 422 & 427.

**12.** In closing argument, the defense, as we read it, also focused primarily on the reasonable doubt as to identity, although counsel made one reference to Landrum's possibly innocent presence.

**13.** Nor did the court's instructions to the jury do much to contain the effect. The court told the jury that they were only to consider the other crimes evidence "as to whether or not it shows that ... Mr. Landrum was knowingly participating in aiding in the armed robbery that's on trial here today. That's the only purpose for which it is admitted, and you should not consider it in any other way as tending to show his guilt of this charge." As we said in *Thompson* of a similar charge, this instruction "appears to require a degree of refinement which, if theoretically achievable, is probably well beyond the ken of the average juror." 546 A.2d at 426.