Tony M. MURPHY, Appellant,

v.

UNITED STATES, Appellee.

No. 87–219.

District of Columbia Court of Appeals.

Argued Jan. 12, 1989.
Decided March 28, 1990.

Lloyd T. Shanley, III, appointed by the court, for appellant.

Kevin A. Forder, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Helen M. Bollwerk and James F. Rutherford, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, TERRY, and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant Murphy was charged by indictment with one count of distribution of hydromorphone (Dilaudid)[1] and one count of possession of hydromorphone (Dilaudid) with intent to distribute it.[2] A jury found him guilty of distribution as charged in the first count, and guilty of the lesser included offense of simple possession[3] under the second count. Murphy contends on appeal that his convictions should be reversed because evidence of another drug sale was admitted at his trial during the government's case in chief, contrary to the teaching of *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964), and the quarter-century of cases which have followed and applied *Drew*. We agree that the evidence was erroneously admitted, but we

---

1. D.C.Code § 33–541(a)(1) (1988).

2. *Id.*

3. D.C.Code § 33–541(d) (1988).

hold that the error was harmless and therefore affirm both convictions.

## I

The government sought to prove that Murphy sold Dilaudid to a woman named Meredith Little, and that shortly thereafter, when Murphy was apprehended with a single Dilaudid pill, he possessed that pill with the specific intent to distribute it. The government's evidence showed that on February 4, 1986, Officer Philip Burton was concealed in an observation post overlooking the intersection of 11th and U Streets, N.W. At about 5:00 p.m. Officer Burton saw a light blue Volvo traveling north on 11th Street. When the car stopped a short distance away, Burton saw that the driver was a woman (Meredith Little) and that appellant Murphy, whom he recognized ("his face was familiar to me"), was in the right front passenger seat. After a short conversation with Little, Murphy removed a pair of fingerless black gloves he was wearing and put his hands together in the area of his waist. He then extended his right hand, with his fingers pinched together as if he were holding something, and placed his fingers into Little's outstretched and cupped palm. Little bent her head over her palm as if inspecting something she had just received, and immediately thereafter she handed money to Murphy. Then Murphy put his gloves back on, got out of the car, and walked down the street as Little drove away.[4] Officer Burton immediately broadcast a lookout for Little and her car. Little was soon arrested, and in her car the police discovered a single Dilaudid pill wrapped in a dollar bill, and a syringe.[5]

About half an hour later Murphy again came into Officer Burton's view. Two men walked up behind Murphy, and the three appeared to converse; then one of the men handed Murphy some money. Officer Burton immediately broadcast Murphy's location and description to an arrest team. When the arrest team arrived in an unmarked cruiser and wearing plain clothes, Murphy started to run. The officers chased him and, after about a block, caught up with him in an automobile repair shop. When one of the officers grabbed him, Murphy and the officer both slipped on a patch of grease and fell to the ground. As he fell, Murphy threw a handful of money to the pavement; the officers recovered it and found that it totaled $75. A subsequent search revealed an additional $151 in cash concealed in one of Murphy's gloves and a single Dilaudid pill in the other glove, enclosed in a partially shattered glass vial.

The government also presented an expert witness, Detective Lawrence Coates of the Metropolitan Police. Detective Coates, largely in response to hypothetical questions, testified that one Dilaudid pill is typically used for two to four injections, that Dilaudid is typically sold around 11th and U Streets, that sellers typically leave the area immediately after a sale to avoid apprehension, that they throw away money in the face of apprehension to avoid being caught with pre-recorded funds, and that they stash their supply of drugs in order to avoid being caught with a large quantity either by the police or by other criminals. Coates was asked detailed hypothetical questions which closely tracked the exchange between Murphy and Little as it had been described by Officer Burton. When asked to characterize a factual scenario duplicating Murphy's behavior, Coates described it as a "classic drug transaction...."[6]

---

4. Officer Burton witnessed these events with the aid of binoculars from an elevation of forty feet above the sidewalk and a distance of seventy to ninety feet. He acknowledged on cross-examination that he could not tell with absolute certainty whether Murphy handed something to Little or *vice versa*, or what, if anything, Murphy gave to Little.

5. Little was also charged in the indictment with possession of Dilaudid and possession of drug paraphernalia (the syringe). The record does not reveal what happened to these charges, but it does show that she was not tried with Murphy.

6. Murphy contends that the trial court erred in admitting this testimony, asserting that Detective Coates was allowed to testify as to the "ultimate issue" of guilt or innocence. This argument is meritless. *See Hinnant v. United States,* 520 A.2d 292, 293–294 & n. 2 (D.C.1987);

At this point the government sought the court's permission to introduce evidence that on a prior occasion Murphy had sold a Dilaudid pill to an undercover police officer. The government had filed a notice of its intent to introduce this evidence several months earlier, and immediately before trial the prosecutor informed the court of his continued desire to offer it. The court, however, told both counsel that it would hear further argument on the issue at the conclusion of the government's case in chief, citing *Graves v. United States*, 515 A.2d 1136 (D.C.1986). In *Graves* we recommended that consideration of the admissibility of other-crimes evidence offered to prove intent be deferred until after the defense presents its case, if any. This procedure ensures that the issue of intent is meaningfully contested, and puts the trial court in the best position possible to weigh the probative value of the evidence against the danger of unfair prejudice. *See id.* at 1142–1143; *see also Thompson v. United States*, 546 A.2d 414, 423–424 (D.C.1988).

When the prosecutor raised the matter again at the conclusion of the government's case, but before the government formally rested, the court asked defense counsel whether Murphy would be testifying in his own behalf. Counsel replied that he might, but only if the evidence of the prior sale were admitted; "if the court does not allow the evidence in ... he does not intend to take the stand." In the discussion that followed, defense counsel argued *inter alia* that merely putting the government to its proof did not constitute "a challenge to the issue of specific intent," but he declined to state in detail what his defense might be or to tell the court whether he expected to ask for a lesser included offense instruction on simple possession under the count charging possession with intent to distribute (PWID). Faced with counsel's reluctance to reveal his strategy, the court assumed nevertheless—given the state of the evidence—that he would argue that the government had failed to prove specific intent and that Murphy possessed the single Dilaudid pill in the vial only for his personal use, and would request a lesser included offense instruction on simple possession under the PWID count.

Having so prognosticated, the court ruled that the other-crimes evidence could be admitted only on the issue of whether Murphy possessed the single pill with the specific intent to distribute it. The court then allowed the prosecutor to introduce evidence that, three months before his arrest in this case, Murphy had sold a single Dilaudid pill to an undercover officer, Debra Vanadia. This evidence was presented through the testimony of Vanadia herself and through a transcript, read aloud in part to the jury, which contained Murphy's guilty plea to a charge of distributing the drug to Officer Vanadia.

Defense counsel then told the court that Murphy had originally intended "to rely entirely upon the burden which the government assumes in bringing a criminal case to convince a jury beyond a reasonable doubt, and not to testify." Because the other-crimes evidence had been introduced, however, Murphy had decided to testify in order "to rebut ... the prejudicial effect of that particular information." Murphy took the stand and admitted that he used Dilaudid frequently. He said that on the day of his arrest he had met his friend Little on the street and that she had agreed to give him a ride to work. Before he left her car, Little handed him a piece of paper with her phone number written on it.

After he got out of the car, he said, he bought a pill in a glass vial for his own personal use. A few minutes later he ran into two acquaintances named Tyrone and Eric. Tyrone, who owed him money for some stereo equipment, paid him $75. Then, according to Murphy, the unmarked cruiser carying the arrest team suddenly came toward him as if to run him down, and for that reason he began to run. Murphy also testified that he did not attempt to throw the $75 away, but that he was struggling to break a hold that the police officer

*Ibn–Tamas v. United States*, 407 A.2d 626, 632 (D.C.1979); *United States v. Johnson*, 174 U.S. App.D.C. 72, 74–75, 527 F.2d 1381, 1383–1384 (1976).

had on his neck. He explained that he had the additional $151 to pay his mother's rent, and denied both that he sold a pill to Little and that he possessed the other pill with the intent to distribute it.

## II

■ The other-crimes evidence in this case was admitted only for its relevance to the specific intent element of the PWID charge in the second count of the indictment. The trial court erred in admitting it because, at the time of the court's ruling, Murphy's specific intent was in issue only because of the nature of the charge itself, not because it was genuinely or meaningfully controverted by the defense. Before the introduction of the evidence, defense counsel did nothing to make specific intent a contested issue. He did not make an opening statement until after the evidence was admitted, did not raise the issue of Murphy's specific intent in his cross-examination of any of the government's witnesses, and did not make any proffers relating to the subject in any way. Counsel recognized that specific intent was at issue only because of "the nature of the charges."[7]

That intent is at issue merely because of the nature of the charges is insufficient as a matter of law to justify the admission of other-crimes evidence. This court's decisions make clear that such evidence is not admissible to prove intent unless the defendant's intent is "a genuinely contested matter in the case and not merely a formal issue." *Landrum v. United States*, 559 A.2d 1323, 1326 (D.C.1989) (citation omitted). This requirement has reached the level of a *per se* rule: "where intent is not controverted in any meaningful sense, evidence of other crimes to prove intent is so prejudicial *per se* that it is inadmissible as a matter of law." *Thompson v. United States, supra*, 546 A.2d at 423; *see also Harper v. United States*, No. 86–1713, slip op. at 9 (D.C. March 27, 1990) ("the intent exception has the capacity to emasculate

the other crimes rule because it is often impossible to distinguish intent from predisposition, and intent is an element of virtually every crime" (citations omitted)). Even before *Thompson* we emphasized that the issue on which other-crimes evidence is offered must be properly raised. *E.g., Pounds v. United States*, 529 A.2d 791, 795 n. 6 (D.C.1987) ("*Drew* exceptions for intent, motive, and absence of mistake are applicable only when the defendant raises affirmative defenses ... thus putting his state of mind in issue[,] or when intent is a material issue" (citation omitted)); *Ali v. United States*, 520 A.2d 306, 310 n. 4 (D.C.1987) ("the issue to which the evidence is said to be relevant must be the subject of genuine controversy" (citations omitted)); *Willcher v. United States*, 408 A.2d 67, 76 (D.C.1979) ("intent must be a material or genuine issue in the case, not merely a formal issue in the sense of entitlement to an instruction" (citations omitted)).

■ "Whether an issue has been raised for purposes of receiving other crimes evidence depends upon both the elements of the offense charged and the defense presented." *Id.* at 75; *accord, e.g., Thompson, supra*, 546 A.2d at 423; *Bigelow v. United States*, 498 A.2d 210, 214 (D.C.1985). While the government was required to prove Murphy's specific intent to distribute as an element of the offense charged in count two of the indictment, that fact alone cannot support the admission of other-crimes evidence. The cases make clear that a defendant must do something which controverts the alleged specific intent in some meaningful way before the prosecution may introduce *Drew* evidence on the issue of intent. That the trial court correctly guessed the defense on which Murphy ultimately relied, *i.e.*, that he possessed the Dilaudid for his personal use and not to distribute it, is of no moment on the question of admissibility. The record makes clear that Murphy would not have taken the stand but for the erroneous ad-

---

7. This is not to say that if counsel had in fact made an opening statement at the outset of the trial, made any proffers, or cross-examined the government's witnesses about Murphy's intent,

the issue would have been "controverted" in the sense required by the case law. *But see Thompson v. United States, supra*, 546 A.2d at 423 n. 16.

mission of the *Drew* evidence. *See Harrison v. United States*, 392 U.S. 219, 223–225, 88 S.Ct. 2008, 2010–11, 20 L.Ed.2d 1047 (1968). Accordingly, we hold that it was error for the trial court to admit the evidence of the earlier sale of a Dilaudid pill to an undercover officer.[8]

### III

■ Having found error, we must next consider whether the error requires reversal, in whole or in part. We begin with the well-settled premise that "the law does not require that a defendant receive a perfect trial, only a fair one...." *Michigan v. Tucker*, 417 U.S. 433, 446, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974); *accord, e.g., Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (citing cases). Thus, despite the error, we must affirm if we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). Considering the strength of the government's case, the limited effect of the error, and the steps taken to minimize any undue prejudice to the defense, *see Franklin v. United States*, 555 A.2d 1010, 1013 (D.C.1989), we hold that the erroneous admission of the other-crimes evidence in this case was harmless.

First, the government's evidence on the distribution count, while not overwhelming, was strong. Although Officer Burton did not actually see a Dilaudid pill pass from Murphy to Little, he testified to a pattern of conduct which, in Detective Coates' expert opinion, typified a "classic drug transaction...." Burton said that Murphy first came into his field of vision while seated in Little's car, that the car stopped, that Murphy removed his gloves, and that he then appeared to retrieve an object from the vicinity of his waist which he placed into Little's cupped palm. Immediately afterwards Murphy left the area, a fact which Detective Coates testified was consistent with the typical behavior of persons who have just completed a drug transaction. Moments later a Dilaudid pill was found in Little's car. When Murphy was eventually arrested, he was found to be carrying a Dilaudid pill concealed in a vial in one of his gloves—the same gloves he had removed while seated in Little's car.

Second, and more significantly, we cannot conclude that the jury's consideration of the distribution count was affected by the erroneous admission of the evidence about the sale to Officer Vanadia, which related only to the PWID count.[9] While it is theoretically possible that the jurors may have considered this evidence as proof of Murphy's propensity to distribute drugs, and thus found him guilty of distribution on that basis, their actual verdict makes this highly unlikely. It is simply unreasonable to conclude that the jury would have acquitted Murphy on the PWID count, finding him guilty of mere possession, and yet would have improperly used the erroneously admitted evidence, contrary to the

---

**8.** With all due respect, we must note our disagreement with our colleague, who states in his concurring and dissenting opinion, *post* at 441, that our discussion here "is unnecessary to our disposition of this appeal." Our view of this case is inherently different from that of our colleague: he would hold that the trial court committed no error, whereas we conclude that there was error but that it was harmless. This is not the same as saying "that if any error occurred, which we do not decide, then it was harmless," *post* at 441 (footnote omitted), which is what we occasionally do in our unpublished memorandum opinions. Our decision here cannot remain unpublished, for under our Internal Operating Procedures (IOP), non-publication is permissible only when the court decides to af-

firm the judgment below and "does not find any error of law." IOP § VIII(D)(6) (1985).

Our colleague also expresses some concern about the risk of "ambush" or "sandbagging" by defense counsel if trial courts in the future are not permitted to do what the court did here. We do not share that concern. There are many weapons in the judicial arsenal to deal with such an ambush if it occurs, and we are confident that a resourceful trial judge will know how to fend off an ambush if one appears imminent. *See Thompson, supra,* 546 A.2d at 424 n. 17.

**9.** A specific intent to distribute is not an element of the crime of distributing a controlled substance.

court's repeated instructions, to find Murphy guilty on the distribution charge. *See Robinson v. United States*, 513 A.2d 218, 222 (D.C.1986) (error, if any, relating only to December 9 offense held "unquestionably harmless" when jury found defendant guilty of offense on December 7 but acquitted him of offense on December 9); *Moreno v. United States*, 482 A.2d 1233, 1236 n. 4 (D.C.1984) (any error was harmless because defendant was acquitted of charge on which evidence was erroneously admitted), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985).[10]

Finally, the steps taken by the trial court to preclude any prejudice to Murphy on the distribution count were substantial. The jurors were amply instructed *five times* that they must not consider the other-crimes evidence in relation to the distribution count at all, but only as to the PWID count, and only on the issue of Murphy's specific intent to distribute. We presume, as we must in the absence of a contrary showing, that the jurors followed these instructions, and we note that defense counsel neither objected to the instructions as given nor proposed any alternative instructions. *See Brown v. United States*, 554 A.2d 1157, 1162 (D.C.1989); *Smith v. United States*, 315 A.2d 163, 167 (D.C.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974).[11]

The judgment of conviction is therefore

*Affirmed.*

SCHWELB, Associate Judge, concurring in part, dissenting in part, and concurring in the judgment:

Under the majority's curious interpretation of *Thompson v. United States*, 546 A.2d 414 (D.C.1988), *Graves v. United States*, 515 A.2d 1136 (D.C.1986), and relat-

ed cases, the prosecution may not introduce other crimes evidence to prove intent to distribute unless the defendant has *previously* disputed the existence of the proscribed intent, no matter what the defendant's subsequent plans may be. Once the evidence has been excluded, my colleagues would apparently permit the defense to change course and to attack the government's case in closing argument on the ground that the evidence of intent is insufficient. In other words, the majority would allow the defense to manipulate the record before the jury by first securing the exclusion of evidence on the theory that intent is not contested and then contesting the sufficiency of the proof of intent in the artificially constricted record which it has contrived to obtain. Because, in my view, this scenario countenances something akin to the "sandbagging" of the prosecution, *see Coreas v. United States*, 565 A.2d 594, 600 n. 8 (D.C.1989), and permits the defense to "ambush" the government contrary to our express warning in *Thompson*, 546 A.2d at 424 & n. 17, I respectfully but emphatically dissent from Part II of the majority opinion, which holds that Judge Kramer committed error by admitting "other crimes" evidence on an issue which my colleagues say was not then a contested one. As I agree with the majority that if error was committed—and in my opinion it was not—then the judge's instructions and the verdict of the jury on the PWID[1] count rendered it harmless, I concur in the judgment of affirmance.

I

I note at the outset that, since all members of the division agree that any error in receiving the proof of the earlier sale was harmless, the discussion in Part II of the

---

**10.** Murphy's conviction of simple possession is unassailable because he admitted possessing the single pill in the vial, testifying only that he possessed it for his personal use.

**11.** *The government* concedes that the prosecutor erred in impeaching *Murphy with* a conviction of possession of Dilaudid immediately after eliciting from Murphy a denial of the drug charges in the instant case. This sequence of questions violated the guidelines set forth in *Dorman v.*

*United States*, 491 A.2d 455, 459 (D.C.1984) (en banc). We hold that this error was harmless, however, for the same reasons that the improper admission of the *Drew* evidence was harmless. *See id.* at 460–462 & n. 9.

**1.** Among those who prosecute, defend or adjudicate in the drug wars, PWID is a colloquial abbreviation of possession with intent to distribute.

majority opinion is unnecessary to our disposition of this appeal. Murphy's conviction could have been—and in my opinion should have been—affirmed in a conventional memorandum opinion and judgment (MOJ) which would have said, as so many of our unpublished opinions do, that if any error occurred,[2] which we do not decide, then it was harmless. The question whether *Thompson* and *Graves* ought to be extended to support the doctrine now embraced by the majority might profitably have been deferred to a day when its resolution would have affected the result. Since my colleagues have elected, unnecessarily in my view, to address the point, I must explicate my reasons for disagreeing with their analysis.

## II

In my opinion, Judge Kramer's resolution of the problem of "intent as a contested issue" was consistent with *Graves* and correctly anticipated our decision in *Thompson*, which was decided after Murphy's trial.[3] The judge initially and quite properly declined to admit the other crimes evidence, preferring to defer her decision until she could make a more informed assessment of the record as it developed. When defense counsel disclosed that Murphy would offer no evidence unless the testimony about the prior sale was admitted, Judge Kramer inquired whether counsel proposed to contest the issue of intent to distribute in his closing argument. No commitment was forthcoming with respect to counsel's intention, and Judge Kramer obviously did not wish to skew the case by allowing the defense to ambush the prosecution. Accordingly, the judge drew the most rational inference from the state of

the record as it then existed—namely, that intent would be contested—and therefore admitted the evidence of Murphy's prior sale. Subject to the *caveat* in Part IV of this opinion, I believe that this is precisely what the judge should have done.

It is instructive to compare the present case with *Thompson*, on which the majority opinion relies so heavily. In that case, twenty-seven tin foils of PCP and marijuana, packaged for sale, were found under the passenger seat of an automobile in which Thompson was riding. Thompson's defense was simple—the drugs were not his. In fact, Thompson testified that he had never possessed the drugs or even seen them. Since he denied any knowledge of the contraband, he was in no position to testify as to the intent with which somebody else possessed it. Under these circumstances, intent was not, nor could it be, an issue in any significant or meaningful sense. Accordingly, we held that evidence of a prior sale was not admissible for the purpose of showing intent to distribute. We noted that the court's approach

> fully protects the legitimate interests of the prosecution and at the same time prevents the premature reception of devastatingly prejudicial evidence in cases in which it may subsequently appear that its admission was unnecessary.

546 A.2d at 424. We also made it clear that the purpose of our ruling was "to avoid undue prejudice, not to ambush the prosecution." *Id.*, at 424 n. 17.

In the present case, on the other hand, the dilaudid pill which was the subject of the PWID charge was recovered from Murphy's glove.[4] It would have been next to impossible for Murphy to dispute the possession element of PWID. As we said in

---

**2.** Since the disposition I contemplate would not have included a finding of error of law (or of lack of such error), but would have pretermitted the issue, the requirement in our IOP § VIII(D)(6) (1985) that we publish opinions in which we find error of law would not in my view have been applicable. *See* majority opinion at 439 n. 8.

**3.** Indeed, Judge Kramer's handling of the matter is so close to the procedure envisaged in *Thompson* that she might be accused of what

Professor Paul Freund used to call the tort of anticipatory plagiarism.

**4.** When Murphy eventually took the stand, he admitted that he possessed the pill, claiming to have purchased it for his own personal use. He denied any intent to distribute it. His testimony confirmed what Judge Kramer had anticipated—possession of the pill being more or less incontestable, Murphy's only meaningful (and ultimately successful) recourse was to contest the intent to distribute prong of PWID.

*Thompson* in discussing the posture of Thompson's codefendant Copeland:

Eight tin foil packets were found on Copeland's person, and he was therefore in no realistic position to deny that he was in possession of the contraband. The issue which he could contest (at least more plausibly than Thompson could in light of the testimony regarding the twenty-seven tin foils) was whether the drugs were for personal use or for distribution. Evidence (if the government had any) that Copeland had distributed drugs on other occasions, though prejudicial, would have been relevant to the central issue in his case, and could have logically rebutted his defense.

*Id.* at 422.

Only one dilaudid pill was found on Murphy, compared with the eight tin foils which were in Copeland's possession. A contention that proof of intent to distribute was lacking in relation to the pill in Murphy's glove was arguably even more plausible than a comparable defense would have been for Copeland. Under these circumstances, when Murphy's counsel declined to take the issue of intent out of the case, Judge Kramer's only reasonable recourse was to conclude that intent to distribute would be contested and to rule accordingly with respect to the admissibility of the evidence of the earlier sale.

### III

An alternative reading of the majority opinion is that, in my colleagues' view, no matter how strong the indications were that specific intent would become an issue, Judge Kramer could not admit other crimes evidence until the defense had actually made it one. If counsel actually did so during closing argument, however, then this secondary reading of the majority opinion would permit the trial judge to admit relevant evidence of other crimes, provided that she did not find it more prejudicial than probative.[5] This scenario would avoid the problem of ambush, but it would surely be impracticable and, indeed, counter-pro-

ductive. If the judge were required to defer admission of such evidence until the probability that the defense would contest intent to distribute had become a certainty, it would be necessary to reopen the record, allow the prosecution to introduce new evidence, and presumably permit a second round of closing arguments. Quite aside from the obvious tension between such a duplicative procedure and principles of "good judicial husbandry," *United States v. Dogan*, 314 F.2d 767, 772 (5th Cir.1963), this approach would unduly highlight the other crimes evidence to the defendant's palpable prejudice.

It is surely far more efficient, and a great deal more fair, to permit the judge, after deferring her decision as to admission of other crimes evidence until the latest practicable moment prior to closing argument, to make an appropriate inquiry of defense counsel and then to factor into her decision counsel's response or lack of response. I recognize, of course, that at least at the pretrial stage, the judge has no inherent authority, in the absence of an applicable statute or rule of court, to require an attorney to disclose his client's defense. *Bowman v. United States*, 412 A.2d 10, 12 (D.C.1980) (*per curiam*). Defense counsel is therefore free to decline to make the disclosure, and the defendant cannot be precluded from arguing a defense upon the ground that he did not disclose it.

To avoid the admission of other crimes evidence bearing on intent, however, defendants have been required to "affirmatively take the issue of intent out of the case." *United States v. Williams*, 577 F.2d 188, 191 (2d Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). Indeed, counsel's indication that the defense would not "actively" contest the issue has been held to be insufficient. *United States v. Holman*, 680 F.2d 1340, 1349 (11th Cir. 1982). While I would not go as far as the court did in *Holman*, especially in cases like *Thompson* in which the defense is essentially "I never had the drugs and I

---

5. Footnote 7 of the majority opinion suggests that this is not what the majority had in mind,

but the point is not expressly disclaimed by my colleagues.

therefore don't know what the possessor intended," *see Thompson, supra,* 546 A.2d at 423; *cf. Landrum v. United States,* 559 A.2d 1323, 1328 n. 11 (D.C.1989) (formal stipulation unnecessary), the question whether the defense is taking the issue out of the case is at least a relevant one, and a judge who wishes to make an informed and conscientious decision must surely ask it.[6] It was not error for Judge Kramer to do so.

## IV

I am troubled by an issue not discussed by the majority, namely, whether the other crimes evidence was relevant at all as to the intent with which Murphy possessed the pill which was recovered from his glove. As we noted in *Thompson,*

[w]here evidence of prior crimes can become probative with respect to intent only after an inference of predisposition has been drawn, the argument for admission is at its weakest, for the distinction between intent and predisposition then becomes ephemeral.

546 A.2d at 421. It is difficult to see how proof that Murphy sold a dilaudid pill to an undercover officer in November 1985 tends to show that he intended to distribute a different pill in February 1986, unless the jury is to draw the impermissible inference that the earlier incident demonstrates a predisposition to sell again.[7] In our discussion in *Thompson* of the circumstances of Thompson's codefendant Copeland quoted at p. 16 of this dissent, on the other hand, we intimated that such evidence might be admissible where intent was genuinely contested. Since I agree with my colleagues that, even if there was error in admitting proof of the prior sale, that error was harmless, I find it unnecessary in this case to attempt to resolve the question of relevancy or to address the relationship here between intent and predisposition.

## V

This court's decision in *Thompson* was designed to assure fairness to the defendant by protecting him from the admission of basically irrelevant and highly prejudicial evidence in circumstances where intent was not meaningfully contested. In my opinion, my colleagues' approach would unfairly preclude the government from introducing relevant evidence where intent *is* meaningfully contested. It is for this reason that I respectfully dissent from Part II of the majority opinion.

---

**6.** Before admitting "other crimes" evidence, the judge is required to weigh its probative value against its prejudicial effect. *Thompson, supra,* 546 A.2d at 428. I do not see how the judge could have done this without inquiring whether intent to distribute was contested.

**7.** Since the government adduced evidence that on the same day officers recovered a pill from his glove, Murphy had sold another pill, the "need" to introduce the evidence of an event which occurred three months earlier was not at its apogee.