**John GREEN, a/k/a Earl McCormack/Erol Pryce, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 87–798.**

District of Columbia Court of Appeals.

Submitted Sept. 27, 1989.
Decided Oct. 11, 1990.

B. Milele Archibald, appointed by this court, was on the brief, for appellant.

Jay B. Stephens, U.S. Atty., Michael W. Farrell and Linda Turner Hamilton, Asst. U.S. Attys. at the time the brief was filed, and William J. Hochul, Asst. U.S. Atty., were on the brief, for appellee.

Before BELSON and SCHWELB, Associate Judges, and REILLY, Senior Judge.

REILLY, Senior Judge:

Appellant was convicted after a jury trial of first degree murder while armed, D.C. Code §§ 22-2401, -3202 (1989 Repl.), assault with intent to kill while armed, D.C. Code §§ 22-501, -3202 (1989 Repl.), and carrying a pistol without a license, D.C. Code § 22-3204 (1989 Repl.). He contends that the trial court erred (a) in refusing to suppress identification testimony by the government's chief witness, and (b) by admitting evidence of prior crimes committed by the accused. Finding appellant's contentions without merit, we affirm.[1]

The evidence offered by the government (appellant presented none) may be summarized as follows:

About midnight on July 25, 1983, Janice Boyoue, tenant of a one-bedroom apartment on Adams Mill Road, N.W., was shot to death while sleeping there. Her thirteen-year-old son, Henry Bost, who was sleeping in the same room, was awakened

---

1. Appellant also contends that the line-up configuration was contrary to Metropolitan Police Department policy and unfairly constituted. We disagree, noting that a "fair and accurate representation" of the line-up was introduced at trial without objection.

by gunfire. Discovering that he was wounded and that his mother was apparently dead, he telephoned the police. As he was hanging up the phone, appellant John Green suddenly appeared, cursed him for calling the police, pointed a gun at him and pulled the trigger. The gun did not discharge. While Green was attempting to reload it, the boy reached over to pull the gun from his grasp. In the ensuing struggle, the gun was dropped, and the boy, eluding his assailant, ran downstairs and out of the building, where police responding either to his call or one placed simultaneously by another tenant, found him lying in the bushes across the street bleeding from a bullet wound in his lower back.

While being transported to a hospital in an ambulance, young Bost told an accompanying police officer that his assailant was a former lover of his mother named John Green, who had lived in her apartment for about six months. About a month prior to the shooting incident, she had broken off the relationship, forced him to leave, and refused to readmit him to the household, despite his threats to kill both mother and son unless she relented.

A homicide detective who interviewed the boy at the hospital while he was recovering from surgery, learned from him that Green had resorted to violence on at least one occasion. During an angry visit at which Green's efforts at reconciliation were rejected, he grabbed a knife from the kitchen and cut the forehead of the boy's mother. She complained to the police; a warrant for Green's arrest charging assault with a deadly weapon was issued, but was never served upon him, as it became mislaid at the police station. Green continued to harass the mother by threatening phone calls, some of which the boy overheard.

The detective also was told by the boy that Green was a Jamaican and used the alias Earl McCormack. Armed with this information, and suspecting that Green had fled the jurisdiction, the detective got in touch with constabulary headquarters in Kingston, Jamaica and received a photograph of a man of that name (or names) who had lived there. He showed it to young Bost, who identified it as a picture of the man he had known as John Green. The detective then used it to prepare posters which were circulated to other law enforcement agencies. More than two years later, Green was arrested in New York by FBI agents, extradited, and transported here. Police arranged for a line-up which Bost was asked to attend. He immediately pointed to Green, who was subsequently indicted and brought to trial. When Bost was called to the witness stand, he again identified appellant not only as Green, but as his assailant in the fatal shooting.

I.

██ In assigning error to the court's denial of the pretrial motion to suppress the line-up and courtroom identifications of appellant by Bost, appellant argues that these were tainted by the fact that only a single photograph, rather than an array of photographs, was shown to this witness by the homicide detective before appellant was taken into custody. He cites a decision, *Mason v. United States*, 134 U.S.App.D.C. 280, 414 F.2d 1176 (1969), for the proposition that the showing of a single photograph involving a single suspect is highly suggestive and may produce a substantial likelihood of irreparable misidentification. In that case, a bank teller who had honored a forged withdrawal slip, told a detective who had displayed a single photograph to her that the subject was the individual who had presented the fraudulent document. The circuit court, in reversing the conviction, quoted some observations of the Supreme Court in *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

A subsequent holding of that Court, *Manson v. Braithwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977), has made clear that even though the initial procedure—an exhibition of a single photograph—might have been unduly suggestive, an appellate court must nevertheless affirm a conviction if under the "totality of circumstances" the identification (and an ensuing identification) was reliable. Our court has accepted this test. *Patterson v.*

*United States*, 384 A.2d 663, 665 (D.C. 1978), *accord, Johnson v. United States*, 470 A.2d 756 (D.C.1983).

In the instant case, there is good reason for believing that the original identification by Bost of the Jamaican photograph as that of appellant Green was trustworthy, for Bost had actually lived with this individual at his mother's apartment, knew his name and geographic background, and informed police weeks before the photograph was shown to him that he recognized him as the gunman in the apartment the night he and his mother were shot. Moreover, it was most unlikely that in subsequently selecting Green from a line-up of several individuals Bost relied upon a fleeting memory of a photograph shown him two years earlier rather than his own recollections of the features and general appearance of a man he had known on a family basis for a period of more than six months. Hence, the court correctly rejected the suppression motion.

■ We also note in passing that it is extremely doubtful that the *Simmons* decision and its progeny disapproving the use of single photographs to establish identity have any relevance to cases like this where the person to whom the photograph is shown is an eyewitness to a crime who has already given police the name of the criminal—a relative, neighbor, or close acquaintance. In this context, the purpose of the showing is merely to make certain that a photograph which the police propose to reproduce and circulate is indeed a picture of the missing criminal. Plainly the likelihood of undue suggestivity is present only in situations where the perpetrator of the crime is a stranger to the witness and the latter is asked to make identification on the basis of a single photograph or by confrontation with a suspect in handcuffs or in a holding cell. As the government brief points out, the courts of this jurisdiction and others have routinely upheld the practice of showing a witness a single photograph of a personal acquaintance or of someone upon whom the witness had a full opportunity to focus during the commission

of the crime. *See Taylor v. United States*, 451 A.2d 859, 863 (D.C.1982); *United States v. Anderson*, 160 U.S.App.D.C. 217, 490 F.2d 785 (1974); *State v. Evans*, 463 So.2d 673, 677, *cert. denied*, 466 So.2d 466 (La.1985).

## II.

■ A somewhat closer question is presented by appellant's objection to the ruling which permitted the government to prove that during the month preceding the murder the accused had assaulted the decedent with a kitchen knife when she refused to resume her relationship with him, tried to enter her window after she had sworn out a warrant, and then made several telephone calls threatening to kill her unless she relented. Aware that evidence of other crimes is generally inadmissible, except for limited purposes, *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), the prosecution filed a pretrial motion detailing the testimony it proposed to submit and arguing that it was admissible under two or more of the exceptions noted in *Drew*. That opinion, *Drew, supra*,[2] recognized that evidence of other crimes could be received if relevant, *inter alia*, to motive, intent, or identity. Judge Weisberg, who heard the motion *in limine*, ruled that the government's proffer was "highly probative and relevant to the questions of motive, intent, and premeditation in a first-degree murder case."

In the light of this ruling, Judge Shuker, who presided at the trial, admitted the testimony of young Bost, who was in his mother's apartment when she was stabbed on the face, had listened in on the threatening phone calls, and had blocked appellant's attempt to force her kitchen window. He also allowed the government to call two police officers, to provide partial corroboration of the stabbing by testimony concerning the victim's complaints and the issuance of an arrest warrant for assault with a deadly weapon.

Appellant argues that testimony describing these incidents of criminal conduct was

---

**2.** *See Drew v. United States, supra,* 118 U.S.App. D.C. at 15–16, 331 F.2d at 89–90.

not only prejudicial, but irrelevant to any issue raised at trial because his counsel conceded for the record that whoever killed Janice Boyoue had done so deliberately. Nevertheless, we perceive no error in Judge Weisberg's ruling for these items of evidence were clearly relevant to motive. Such testimony threw light upon two reasons for the killing: (1) an announced course of revenge, and (2) a perceived necessity for silencing the complainant who had obtained an outstanding felony warrant before it could be executed.

Appellant's reliance upon *Thompson v. United States*, 546 A.2d 414 (D.C.1988), for the contention that the granting of the motion was wrong, ignores the distinction between intent and motive. In *Thompson*, a defendant was indicted for possession of narcotics with *intent* to distribute after a search of an automobile in which he had been riding uncovered a large quantity of tinfoil packets under his seat. On the assumption—which turned out to be unfounded—that the defense would be lack of intent to distribute, the government moved successfully pretrial for permission to show the jury that the defendant had been caught selling drugs in the same neighborhood only five months before his arrest on the instant charges. When the case went to trial, however, no issue concerning intent was raised. Asserting that he was unaware of the presence of drugs in the car, the defendant denied any kind of knowing possession. In reversing conviction, we observed that "where intent is merely a formal issue derived from the elements of the offense and is not being controverted, the argument for receiving such evidence falters." Accordingly, we held that the admission of the challenged

evidence, because it suggested that the accused had the propensity to commit similar crimes, amounted to prejudicial error. *Thompson, supra,* 546 A.2d at 422–23.[3]

In contrast to *Thompson*, the challenged evidence here was admissible not only for its bearing on motive, but also because it was highly relevant to the issue of identity. *See Williams v. United States*, 549 A.2d 328, 331–32 (D.C.1988). When the case went to trial, appellant did not deny that he was the Jamaican who had been the victim's lover, but did take the position that the shooting of both mother and son was the act of some other unknown person. Thereafter he sought to convince the jury that his identification by the son at the scene of the crime was mistaken, because the smoke, darkness, and trauma of the setting deprived the wounded boy of any opportunity to recognize the features of his assailant. This court has held that where the identity of the decedent's murderer is drawn into issue, evidence of prior altercations of a substantive and violent nature between the accused and the decedent is probative provided such incidents are proved by something other than hearsay. *See Clark v. United States*, 412 A.2d 21, 28 (D.C.1980). In *Clark*, a murder conviction was reversed because the only evidence of such events consisted of statements attributed to the decedent. In the instant case, however, the evidence of similar criminal misconduct was presented not by hearsay testimony, but by a witness who had seen and heard these occurrences. We also note that leading commentators on the law of evidence, as well as our own court, have recognized the relevance of motive as a means to establish identity.[4] *See* McCor-

3. The *Thompson* opinion also indicated that rulings on the admissibility of other crimes evidence should ordinarily not be made in advance, but should be reserved until the court was in a position to see how the issues were developing at trial. In the case before us, Judge Weisberg, apparently aware of this warning, consented to entertain the pretrial motion only because appellant's counsel at that time agreed that a ruling would be helpful in the preparation of the trial defense.

4. It is true that in one decision (cited by appellant) where identity was an issue, this court in

reversing a conviction for threats to do bodily harm, did hold that evidence of prior violent criminal acts against the complainant should not have been admitted. *Campbell v. United States*, 450 A.2d 428 (D.C.1982). The opinion pointed out, however, that such incidents were not so closely related in terms of time and place as to be necessary to complete the story of the crime for these events had occurred seven months before the date of the charged crime (two threatening telephone calls). *See id.* at 431 n. 4. In the instant case, however, the assault, threats, and attempted housebreaking had all

MICK ON EVIDENCE at 562 (3d ed. 1984) and WRIGHT AND GRAHAM: FEDERAL PRACTICE AND PROCEDURE, § 5240 at 480 (1978 ed.).

*Affirmed.*

happened within the fortnight preceding the fatal shooting, and were thus far more revealing

with regard to the motivation of the principals on the day of the crime.