Bobby E. HAZEL, Appellant,

v.

UNITED STATES, Appellee.

Nos. 87–127, 87–128, 89–1160, 89–1239, 89–1376 and 89–1387.

District of Columbia Court of Appeals.

Argued Nov. 14, 1990.
Decided Oct. 31, 1991.

W. Gary Kohlman, appointed by this court, with whom Mark J. Rochon, Washington, D.C., was on the brief, for appellant.

Stevan E. Bunnell, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Elizabeth Trosman, Terence J. Keeney and Kevin Ohlson, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before STEADMAN, SCHWELB and WAGNER, Associate Judges.

STEADMAN, Associate Judge:

This case concerns a falling out between two partners in a drug operation—appellant Bobby Hazel and his erstwhile colleague Walter Curry—and their multiple venting of bad blood by shooting at each other in a variety of public settings. The two principal issues on appeal deal with, first, the admission of evidence of uncharged criminal acts as background to and occurring in the course of the on-going feud, assertedly in violation of *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), and second, the trial court's reinstruction of the jury in appellant's involuntary absence, assertedly in violation of the right to be present at every stage of the trial under Super.Ct.Crim.R. 43(a).[1] We affirm.

## I: The Facts

Appellant was charged in a seven count indictment with two counts of assault with intent to kill while armed (AWIKWA), D.C.Code §§ 22-501, -3202 (1989), two counts of carrying a pistol without a license, *id.* § 22-3204, conspiracy to kill, *id.* § 22-105a(a), obstruction of justice, *id.* § 22-722(a)(1), and bribery, *id.* § 22-713(a)(1).

At the ensuing trial before a jury, the government was permitted to present evidence establishing the following series of events. During late 1982 and early 1983, Curry, appellant, and a number of others were all confederates in a drug operation. On January 11, 1983, at appellant's behest, Terry Caison, who was not part of the drug operation, and appellant broke into an apartment in Maryland and stole a safe where drug proceeds were stored. Curry suspected appellant of the theft, confronted him, and demanded return of his portion of the cash. Appellant denied the theft and refused to pay Curry.

Then began a series of violent reprisals. In immediate retaliation that same day, Curry stole heroin from two of appellant's "runners" and gave it out free on the streets. The next day, January 12, Curry again went to demand his money, but when appellant saw him coming, appellant commenced shooting at Curry, chasing Curry through the street until he escaped by climbing over a fence. Thereafter, appellant drove to Curry's residence, and again engaged Curry in a gun battle in the streets. None of these shootings resulted in any of the charges against appellant.

On February 13, 1983, Curry and a friend were sitting in a Rib Pit restaurant when Curry was suddenly hit by three bullets. An ambulance took Curry to Howard University Hospital. Curry identified appellant as his assailant. For this shooting, appellant was charged with one of the counts of AWIKWA and one of the counts of carrying a pistol without a license.

During Curry's stay in the hospital from February 13th through the 16th, appellant allegedly conspired with Caison and two

---

1. Appellant also argues that the trial court abused its discretion by refusing to grant his motion to sever the two charged shooting offenses and erred in refusing to conduct a hearing on his motion for new trial due to newly discovered evidence. To show abuse of discretion by the trial court in denying severance, an appellant must show "the most compelling prejudice" from which "the court would be unable to provide protection." *Winestock v. United States*, 429 A.2d 519, 527 (D.C.1981) (citations omitted). We perceive no such prejudice here. Likewise, the trial court did not abuse its discretion in denying a hearing on the ground that appellant's motion and affidavits failed to satisfy the established prerequisites for a new trial based on newly discovered evidence. *Heard v. United States*, 245 A.2d 125, 126 (D.C.1968); *Thompson v. United States*, 88 U.S.App.D.C. 235, 236, 188 F.2d 652, 653 (1951). Appellant's appeals from his other post-trial motions are equally meritless.

women to have Caison kill Curry in his hospital bed. This formed the basis for the conspiracy count.

On February 21, 1983, after his release from the hospital, Curry again saw appellant on the street, and a gun battle ensued, allegedly initiated by appellant, including a chase into a Popeye's eatery. This incident did not result in any charges against appellant.

After a period of relative calm, on May 19, 1984, appellant shot Curry one final time as Curry sat on a stoop talking to a friend. Curry was hit in the chest and, after he raised his arm to protect himself, in the arm. Curry and his friend identified appellant as the gunman. This was the conduct subjecting appellant to the second set of charges of AWIKWA and carrying a pistol without a license.

On June 26, 1984, in the District of Columbia jail, appellant allegedly offered Curry money if he would refuse to testify against him. This conduct generated the obstruction of justice and bribery counts.

The trial court dismissed the obstruction count, and appellant was found not guilty of the bribery and conspiracy counts. He was convicted of both AWIKWA counts and the related counts of carrying a pistol without a license.[2]

## II: Other Crimes Evidence

Appellant first challenges the trial court's admission of evidence of the drug operation, the burglary, and the uncharged shootings as violative of the prohibition against the admission of "other crimes" evidence except for certain specific purposes. *See Drew v. United States, supra,* and succeeding cases. The trial court's ruling on the government's motion to admit this evidence followed an extensive dialogue with counsel. The trial court admitted the evidence [3] as probative of the defendant's identity, motive, and intent in committing the offenses for which he was being tried, to prove a common scheme which included the offenses being tried, and to explain the surrounding circumstances.[4] The government presses for affirmance under the motive and common scheme exceptions.[5]

### A: Motive/Identity

■ With respect to the motive exception, appellant contends that since his de-

---

**2.** Subsequent to the original indictment, appellant was charged with a count of failing to appear in violation of D.C.Code § 23–1327(a). This count, joined with the others for trial, resulted in a fifth conviction.

**3.** Other crimes evidence, at least where unrelated to the charged crimes, must be proven by "clear and convincing evidence." *Groves v. United States,* 564 A.2d 372, 374 (D.C.1989) modified *per curiam,* 574 A.2d 265 (1990). We do not understand appellant to have raised at trial this particular objection to the admission of the other crimes evidence, and we do not find the absence of explicit findings by the trial judge on this point with respect to each instance to have led to a "miscarriage of justice." *Lewis v. United States,* 567 A.2d 1326, 1331 (D.C.1989) (noting that "had counsel requested that the trial court make a clear and convincing finding, it could well have responded by doing so"). The trial court also balanced probative value and prejudice and gave limiting instructions to the jury, both following opening statements and at the close of all the evidence.

**4.** In this jurisdiction, evidence of other criminal activity to explain "the circumstances immediately surrounding the charged offense" may be admitted without any cautionary instruction only when such activity is temporally proximate to the charged crime. *Parker v. United States,* 586 A.2d 720, 724 (D.C.1991) (quoting *Toliver v. United States,* 468 A.2d 958, 960 (D.C.1983)); *Holmes v. United States,* 580 A.2d 1259, 1266–67 (D.C.1990). Under what circumstances, if any, such illuminating evidence may come in as a *Drew* exception and subject to the accompanying safeguards is not clear in our case law, although the standard instructions appear to contemplate such possible admissibility. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.49 (3d ed. 1978). In *Parker,* we were careful to limit our discussion of *"Toliver* evidence" to that which may be introduced without any limiting instruction and which is not other crimes evidence as generally understood. 586 A.2d at 724 n. 6. In its limiting instructions given immediately after the opening statements, the trial court included explanation of the "surrounding circumstances" as one of the purposes for which the jury could consider the other crimes evidence, but this purpose was not repeated in the final instructions. We therefore do not consider further here the possible application of such an exception.

**5.** It is not clear why the government has not advocated the other bases accepted by the trial court for admitting the disputed evidence.

fense was misidentification, intent and state of mind were not contested issues, and the use of *Drew* evidence of motive as probative of his intent was error. *See Thompson v. United States,* 546 A.2d 414, 423 (D.C.1988) [6] (evidence of other crimes to prove intent not admissible "where intent is not controverted in any meaningful sense").

This argument understates the nature of the motive exception. We have permitted the introduction of *Drew* evidence to prove motive in circumstances very similar to those of the instant case. *See Hill v. United States,* 600 A.2d 58 (D.C.1991); *Green v. United States,* 580 A.2d 1325 (D.C.1990). In *Hill,* we held admissible evidence of an appellant's uncharged assault on the victim, and the victim's subsequent complaints against him, to prove his motive to commit the charged murder of the same victim four months later. We said that where " 'the accused denies that he committed the act,' as in this case, 'the prosecutor is permitted, as part of his effort to prove that the particular accused did commit the act, to prove that the accused had a motive for killing the deceased.' " *Hill, supra,* 600 A.2d at 61–62 (quoting *Collazo v. United States,* 90 U.S.App.D.C. 241, 247, 196 F.2d 573, 578, *cert. denied,* 343 U.S. 968, 72 S.Ct. 1065, 96 L.Ed. 1364 (1952)).

In *Green,* relied upon by *Hill,* we upheld the admission of evidence that, during the month preceding the charged offenses (including murder), the appellant had assaulted the decedent with a knife when she refused to resume a relationship with appellant, tried to break into her home, and made threatening phone calls. On appeal, the appellant argued that the testimony was irrelevant to any controverted issue because appellant's defense was misidentification [7] and his counsel had conceded for the record that whoever committed the

charged crimes had done so deliberately. We distinguished *Thompson, supra,* finding the evidence admissible not only to prove motive, but also because it was highly relevant to the unquestionably contested issue of identity. We said: "This court has held that where the identity of the decedent's murderer is drawn into issue, evidence of prior altercations of a substantive and violent nature between the accused and the decedent is probative provided such incidents are proved by something other than hearsay." *Green, supra,* 580 A.2d at 1328.

Although *Green* analyzed the admissibility of the evidence under the separate *Drew* exceptions of motive and identity, it implicitly recognized the relevance of the motive exception, not because motive was an element of the crime or a controverted issue as such, but rather because proof of motive inferentially proved identity, an actually controverted material issue or element. *See Hill, supra,* 600 A.2d at 61–63. Indeed, *Green* states specifically at the end of the opinion that "leading commentators on the law of evidence, as well as our own court, have recognized the relevance of motive as a means to establish identity." 580 A.2d at 1328 (citing McCORMICK ON EVIDENCE at 562 (3d ed. 1984) and WRIGHT & GRAHAM, FEDERAL PRACTICE & PROCEDURE, § 5240 at 480 (1978 ed.)). As McCORMICK states, "the evidence of motive may be probative of the identity of the criminal" and "the second (larger plan), third (distinctive device), and sixth (motive) [grounds of admissibility of other crimes] seem to be most often relied upon to show identity." McCORMICK, *supra,* at 562–63; *see also Bartley v. United States,* 530 A.2d 692, 702 (D.C.1987) (Mack, J., dissenting) ("The introduction of independent crimes is justified if, and only if, proof of the motive or scheme proves the perpetrator's identity,

---

**6.** Appellant also cites to *Pounds v. United States,* 529 A.2d 791, 795 n. 6 (D.C.1987) and *Graves v. United States,* 515 A.2d 1136, 1140 (D.C.1986). These cases are not apposite. In neither one was there any issue of identity; the alleged offenses (sexual abuse of a minor and soliciting for prostitution) were committed by the defendants or not at all.

**7.** Likewise, appellant's defense in the case before us was that Curry had been assaulted by others and that Curry had a bias against appellant. Appellant presented evidence of an alibi with respect to the second charged incident.

intent, or his commission of the charged crime by means of the following legitimate inference: the evidence of the motive or scheme increases the probability of a defendant's participation in the charged crime by setting him apart from others who had no such motive or scheme").

Here, just as in *Green* and *Hill,* identity was a specifically identified "contested element of the charged crime which [motive] evidence inferentially proves." *Ali v. United States,* 520 A.2d 306, 310–11 (D.C.1987) (emphasis deleted). The trial court here similarly found the "motive evidence" to be "highly probative ... as to the identity of the perpetrator." Moreover, several other cases in this jurisdiction have upheld the admission of motive evidence in similar circumstances. *See, e.g., Young v. United States,* 515 A.2d 1090, 1095 (D.C.1986) (evidence of uncharged attempted armed robbery perpetrated by appellant and accomplice properly introduced to prove motive for appellant to murder accomplice a month later "in light of appellant's belief that he had been abandoned by [the accomplice] both then and on the night of the murder"); *Bigelow v. United States,* 498 A.2d 210, 213–14 (D.C.1985) (evidence that carrying a stash of money, assuming it proved the crime of drug-dealing, admissible to prove motive for possessing gun in trial for carrying pistol without a license because "relevant to prove that appellant [who asserted misidentification defense,] and not the other persons in his car, possessed the pistol"); *United States v. Bobbitt,* 146 U.S.App.D.C. 224, 228, 450 F.2d 685, 689 (1971) (threat to victim twelve years before charged shooting admissible to prove motive, *i.e.,* to show that hostility to the deceased was intense enough to lead to shooting and that it was defendant who reached for pistol, not deceased; "The prior relationship between the parties is obviously material in determining what motive the defendant might have had to shoot decedent. Here, where there was other evidence that there had been 'bad blood' between appellant and the deceased, ... continuing over a period of years, the judge did not abuse his discretion in admitting evidence of a prior threat with a shotgun").

We therefore conclude that the evidence of the other crimes here was properly admitted under the motive exception to *Drew.* We can see no abuse of the trial court's discretion in its findings that the other crimes evidence directly related to the "bad blood" motive here, was relevant to the contested issue of appellant's identity in committing the charged crimes, and was more probative than prejudicial.

### B: Common Scheme or Plan

■ Under much the same reasoning, the trial court did not err in admitting the other crimes evidence to prove common scheme or plan. In *Ali, supra,* where appellant was charged with committing sexual offenses against one child and the trial court admitted evidence of uncharged sexual abuse against that child's younger sister, we stated that "common scheme or plan evidence is inadmissible unless the proponent specifically identifies the contested element of the charged crime which the common scheme or plan evidence inferentially proves." 520 A.2d at 310–11 (emphasis deleted). Just as the other crimes evidence was properly admitted to prove motive because motive inferentially demonstrated the identity contested by appellant, so was the evidence admissible to prove a common scheme or plan "because the common scheme or plan evidence inferentially proved the perpetrator's identity: the existence of the [plan to inflict injury] raised the probability of the appellant's participation [in the charged offenses] by setting him apart from other persons who had no such plan" to shoot Curry. *Id.* at 312. The commentary relied upon by the *Ali* court is consistent with this concept: while that commentary states that the crimes must be "mutually dependent" or "different stages of the plan," it also asserts that the underlying theory of logical relevance

is strikingly similar to the ... motive cases [, where] the uncharged act evidences the motive or emotion that impels the charged crime as well; the charged and uncharged crimes both are effects of the same cause, a motive such as hostility toward the victim of both crimes.

E. Imwinkelried, Uncharged Misconduct Evidence § 3:20, at 51 (1984 and 1990 Supp.).

The evidence of the drug operation, burglary, and uncharged shootings flowing from them offered the jury "the inference of a specific plan in the accused's mind which interconnect[ed] the uncharged and charged acts," and thus the other crimes evidence was not presented to show "the accused's propensity to commit a series of similar but discrete bad acts." *Ali, supra,* 520 A.2d at 311. Rather, "the ultimate inference generated by [the] other crimes evidence ... [was] the defendant's greater likelihood of guilt on a contested issue in the case." *Id.* The evidence was thus properly admitted under the common scheme or plan exception to *Drew. See, e.g., Hackney v. United States,* 389 A.2d 1336 (D.C.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979) (where identity of murderer at issue, evidence of a series of murders to cover-up original murder would have been properly admitted at separate trials). *See generally* Imwinkelried, *supra,* §§ 3:20–3:23, ch. 3.

It is important to note as well that consideration of the "common scheme or plan" here is markedly different from the situation in *Ali,* where the uncharged incident of sexual abuse was against a different person than the complainant in the charged crime [8] and where the issue was not whether the defendant or someone else committed the crime but whether the crime was committed at all by defendant.[9] Here,

where there was no significant dispute that the assaults occurred, the issue was whether Hazel committed them; the prior incidents directly related to that issue, involving as they did the identical parties. Thus, unlike the situation in *Ali,* where the events involved "discrete acts of misconduct" and "similar but non-interlocking crimes," 520 A.2d at 310, 312, the events here may fairly be viewed as "mutually dependent" and evidencing a "true plan in the defendant's mind"; *viz.,* to commit harm upon Curry. Otherwise put, it is not the case here that "the uncharged collateral acts are simply unconnected to the historical events of the charged crimes...." *Id.* at 310. To the contrary, all the evidence of the uncharged crimes, including the drug operation and burglary, was connected historically; each crime or bad act was a piece of the puzzle of appreciating appellant's plan to engage in the charged acts. Thus, each of the other crimes comprised an organic link in the story of the charged crimes, such that without the predecessor crime, each successor crime would probably not have taken place.[10] In the circumstances here, the evidence was therefore admissible under the common plan or scheme exception to *Drew* as probative particularly of appellant's identity.

### C: Intent

■ Appellant argues that even if the trial court properly admitted the *Drew* evi-

---

8. *Cf. Pounds, supra* note 6, 529 A.2d 791, where evidence of prior sex abuse of the same complainant by the defendant was admitted on a predisposition theory. We also noted there that without such information, certain aspects of the charged crime "would be difficult to understand without the context of facts showing longstanding sexual abuse by her father," and in that regard "[t]he circumstances are somewhat akin to those situations where we have found that the evidence was inextricably interwoven with the crime and therefore not *Drew* evidence." *Id.* at 795, citing *Toliver, supra* note 4, 468 A.2d at 960.

9. Indeed, it may be said that in a broader sense, all the so-called other crimes evidence here is somewhat distinct from what might be called the "classic" *Drew* situation; *viz.,* where the defendant has allegedly committed two distinct, unrelated crimes, but typically similar in nature, one of which is sought to be introduced in

the trial of the other. *See, e.g., Bartley, supra,* 530 A.2d 692. There, the concern for use as "propensity" is at its height, and probative value weakest. However, where the bad acts form, so to speak, part of the overall story of the charged crime, although not occurring as a temporal part of that crime, the relevance and probative effect may assume to some degree a different dimension. This would seem particularly the case where the evidence deals with direct relationships between the defendant and the complainant. *See, e.g., Clark v. United States,* 593 A.2d 186 (1991). *See also supra* notes 4 and 8.

10. Moreover, just as with the motive exception, it is relevant to establishing admissibility under the common plan exception that the jury would not have understood appellant's plan to kill Curry without hearing the background misconduct evidence.

dence under one or more specific exceptions, its instructions to the jury impermissibly allowed the evidence in "on every conceivable theory: identity, intent, common scheme or plan, motive, and surrounding circumstances." This, he argues, is the " 'shotgun,' 'laundry-list,' or 'banquet-style' approach" which "has been criticized by this court" because "potential misuse of *Drew* evidence under one exception is not cured by simultaneous admission under an appropriate exception." Appellant is correct in asserting that individual trial court attention should be given to each potential ground for admissibility and the limiting instruction tailored to permit use of the *Drew* evidence only for the purposes for which it is properly admissible. "The shotgun approach short-circuits the process [of the *Drew*-exception analysis] in a number of ways," *Bartley, supra,* 530 A.2d at 703–04 (Mack, J., dissenting), and is "analytically imprecise." *Thompson, supra,* 546 A.2d at 420.

■ However, in this case, as demonstrated above, the evidence was in fact permissible for consideration by the jury as probative of motive and a common scheme or plan in bearing upon the ultimate issue of identity. Thus, the only purpose listed by the trial court in its final instructions to the jury[11] which may not have been a permissible one was "intent." We have previously pointed out at some length the caution that must be used with the admission of *Drew* evidence under the intent exception, given the danger that it may be treated as nothing more than proof of predisposition. *See Thompson, supra,* 546 A.2d at 420–22. However, in *Thompson,* the evidence was admissible only for intent,

if at all, in its rather specialized meaning as bearing upon the defendant's state of mind at the moment of commission of the crime. Here, the limiting instructions warned the jury in one breath that it could only use the evidence for several enumerated purposes. With identity a dominant issue in the case, it would appear plausible that, in the context of the instruction, intent would be understood in a broader meaning as closely synonymous to motive and its probative effect on identity.[12]

Moreover, without discounting the need for precision in fashioning a *Drew* instruction, our opinions in general recognize that once *Drew* evidence has been found properly admissible under one exception, the evidence is in the case and before the jury; therefore, any instructional error in also permitting its consideration for unfounded *Drew* purposes is typically not so prejudicial as to warrant reversal. *See Groves, supra* note 3, 564 A.2d at 377 (where evidence properly admitted for identity but not common scheme, "the error was harmless"); *Calaway v. United States,* 408 A.2d 1220, 1227 n. 12 (D.C.1979) ("since the evidence [of a prior crime] was admissible under the intent, motive and identity exceptions, its admission under the 'sexual predisposition' exception was harmless error"). *Cf. Bartley, supra,* 530 A.2d at 696 (where jury instructed evidence of robbery could be used to show intent, identity, and common scheme or plan, no reversible error despite inapplicability of intent exception); *Gates v. United States,* 481 A.2d 120, 124–25 (D.C.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985) (not reversible error to admit other crimes evi-

11. *See supra* note 4.

12. As to all of the uncharged crime evidence, the court instructed the jury to consider it, if the jury accepted the evidence at all, "only for the[ ] limited purposes" of establishing intent, motive, identity, and common scheme or plan. The court cautioned that the jury could only use the evidence "for these limited purposes, and you should not consider it as in any other way tending to show the defendant's guilt of the offenses for which he is now on trial." *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.49 (3d ed. 1978). The defendant made no request for any elaboration or change in this

standard instruction. Appellant's argument, raised for the first time on appeal, that the evidence may have been erroneously admitted and used in part as showing the victim's motives, rather than appellant's, comes too late. *Cf. United States v. Miller,* 283 U.S.App.D.C. 9, 895 F.2d 1431, *cert. denied,* — U.S. —, 111 S.Ct. 79, 112 L.Ed.2d 52 (1990). In any event, the evidence of motive may be fairly extended to whatever is necessary to understand its source. The issue would not be admissibility but the discretionary weighing of probative value and prejudice.

dence to show intent, identity, or common scheme or plan despite inapplicability of intent exception).

Here, we do not think that the inclusion of intent in the instruction constituted reversible prejudice. In addition to the considerations already discussed, we note that the jury found appellant not guilty of two of the charged counts, and the prosecutor's use of the evidence was to portray the Hatfield–McCoy nature of the relationship between appellant and Curry so the jury could understand the charged crimes and appellant's motive to commit them. This was the very thrust of admissibility. The jury need not be read the story beginning in the middle of the book. In sum, we perceive no grounds for reversal in the admission of the challenged *Drew* evidence.[13]

### III: Defendant's Absence at Reinstruction

Appellant further argues that reversal is warranted because the trial court reinstructed the jury in appellant's absence in contravention of Super.Ct.Crim.R. 43 and the Fifth Amendment due process clause.

### A: The Reinstruction

At about 4:30 p.m. on the day before the jury's verdict and after two and one half days of jury deliberation, the trial court reconvened, with appellant continually in presence, to consider three questions posed in a jury note, including a question about the meaning of the "beyond a reasonable doubt" standard.[14] After a discussion between both counsel and the trial judge, the court determined to reread the relevant portions of the instructions to the jury. Appellant's counsel explicitly made no objection to the rereading, but did suggest that it take place the next morning. Since it was approaching time for the evening recess anyway, the trial court agreed to give the reinstruction the next day; thus, after the jury returned, and still in appellant's presence, the trial court excused the jury until the next morning.

At 9:15 the next morning, since appellant was absent due to the government's transportation delay, appellant's counsel decided to waive appellant's presence for him so the judge could move things along. The judge promised to give a cautionary instruction that appellant was absent because of travel conditions, which he later forgot to give when he actually reinstructed the jury.[15] Defense counsel neither objected nor restated a demand for the cautionary statement, however. Later that morning, the jury reached its verdict, and appellant was present by the time the verdict was returned.

---

**13.** Appellant at trial did not differentiate in his objection among the several instances of other crimes evidence or seek to sanitize certain portions, perhaps because the totality of the evidence tended to paint Curry, the key government witness, in a very negative light. On appeal for the first time, appellant singles out the evidence of the burglary and the drug relationship. *Cf. Hill, supra,* 600 A.2d at 63 (admission of "vast quantity of collateral evidence" concerning prior bad acts not plain error). In any event, as a matter of admissibility, whatever is fairly necessary to illuminate the motivation of appellant and its source is potentially eligible for a *Drew* exception. Appellant's argument really goes to the issue of an abuse of discretion in weighing probative value against prejudice. The trial court engaged explicitly in such a weighing and we perceive no abuse of discretion here.

**14.** The jury note read in its entirety: "Please explain to the jury what 'beyond a reasonable doubt' means. Please explain the consideration we are to give to circumstantial evidence. What constitutes bribery?"

**15.** The transcript of the proceeding reads as follows:

THE COURT: [A]s I recall, we were to reinstruct the jury this morning. However, I understand that Mr. Hazel is not here yet.

[Defense Counsel]: Your Honor, I am aware of that. [The prosecutor] and I discussed the matter. It's been no secret to this jury that Mr. Hazel is incarcerated. I am prepared to waive his presence. Go ahead and reinstruct the jury as long as the court gives them a cautionary instruction that there has been a traffic problem, and go ahead and reinstruct.

THE COURT: I will simply say that, because of travel conditions, Mr. Hazel is not with us, and I am going to proceed with instructions.

The trial judge thereupon proceeded to reinstruct the jury in open court on all three questions presented by the jury, without any reference to appellant.

## B: Right to be Present

■ Appellant argues that the trial judge erred in reinstructing the jury in his involuntary absence, despite the fact that his counsel waived his presence, and that he was thereby prejudiced. Cases in this jurisdiction have held that reinstruction constitutes a "stage of the trial" for the purposes of Super.Ct.Crim. Rule 43(a).[16] *Wade v. United States,* 142 U.S.App.D.C. 356, 358–59, 441 F.2d 1046, 1048–49 (1971);[17] *see Smith v. United States,* 542 A.2d 823, 826 (D.C.1988) (refusal to permit defense counsel or defendant to read jury note violates Rule 43 entitlement to presence "at every stage of the trial"). The government concedes that appellant had a Rule 43 statutory right to presence at reinstruction here. Further, this Rule 43 right is arguably reflective of a protection of the Due Process Clause of the Fifth Amendment requiring constitutional "knowing and intelligent" waiver by appellant himself. *Wade, supra,* 142 U.S.App.D.C. at 359 & n. 10, 441 F.2d at 1049 & n. 10 (suggesting without deciding that Rule 43 assimilates constitutional safeguards at reinstruction stage); *see Kimes v. United States,* 569 A.2d 104, 108, 110 (D.C.1989) (defendant constitutionally guaranteed personal right to presence at " 'any stage of the criminal proceeding that is critical to its outcome if his [or her] presence would contribute to the fairness of the procedure' ") (citation omitted); *Harris v. United States,* 489 A.2d 464, 469 n. 5 (D.C.1985) (defendant has constitutional right to be present at every stage of his trial, including all communications between the judge and jury, which is personal and may be violated even where defense counsel present).

## C: Harmless Error

■ Assuming that the trial court constitutionally erred in going forward with reinstruction in appellant's absence, we nonetheless find that the government has met its burden of proving the error harmless beyond a reasonable doubt.[18] *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *See Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) ("[W]e have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt"); *Rushen v. Spain,* 464 U.S. 114, 117–19, 104 S.Ct. 453, 454–56, 78 L.Ed.2d 267 (1983) (denial of defendant's right to be present at all stages of trial due to *ex parte* communication between judge and juror held harmless error); *United States v. Fontanez,* 878 F.2d 33 (2d Cir.1989) (applying *Chapman* harmlessness test to read-back of testimony in response to jury note during jury deliberations and modified *Allen* charge given to deadlocked jury); *Kleinbart v. United States,* 553 A.2d 1236, 1240 (D.C.1989) (applying beyond a reasonable doubt standard to improper exclusion of defendant from voir dire at bench); *Harris, supra,* 489 A.2d at 468–70.

---

16. Rule 43(a) states, in pertinent part:
   The defendant shall be present at ... every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this Rule.
   The exceptions include waiver of the right to be present where the defendant, initially present, "[i]s voluntarily absent after the trial has commenced." Rule 43(b)(1).

17. The decision was rendered January 18, 1971, before the effective date of *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971).

18. Appellant does not argue that any error here calls for per se reversal. As this court has recently stated, "in at least one instance we appear to have concluded there was reversible error *per se* when the trial court found, after a remand, that the defendant's absence from trial during the testimony of witnesses had been involuntary." *Kimes, supra,* 569 A.2d at 111 n. 8, citing *Black v. United States,* 529 A.2d 323, 324–25 (D.C.1987). However, *Kimes* uses the word "appear" because we did not in fact flatly apply a per se test in *Black,* finding the error not harmless beyond a reasonable doubt. In any event, unlike the instant case, *Black* involved the "appellant's right to be present in court while witnesses are testifying" where any error "is far more egregious ... [because] defendant's rights to due process, confrontation, and effective assistance of counsel are all implicated." 529 A.2d at 324.

In *Wade*, the court credited the "psychological influence" factor of a defendant's presence at reinstruction, stating that "the same influence pertains to the right of confrontation of defendant and jury" as to the Sixth Amendment right to confront witnesses. 142 U.S.App.D.C. at 360, 441 F.2d at 1050; *cf. Kimes, supra*, 489 A.2d at 111 (psychological influence of presence at return of verdict, where jury subject to polling). Appellant makes the same type of argument here, especially with respect to the reinstruction stating the fundamental standard of proof in a criminal trial.

However, appellant's absence from the reinstruction here was highly unlikely to lead to any prejudice. The reinstruction was an entirely mechanical process, which might just as well have been sent to the jury in writing. *See Quarles v. United States*, 349 A.2d 690, 692 (D.C.1975) (rejection of right to presence at submission of trial exhibits to jury after jury request because of the "ministerial nature of the activity and the lack of unusual circumstances"), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976) (cited in *Harris, supra*, 489 A.2d at 468). There was no discourse or oral questioning involved, and counsel remained silent throughout. The jury had previously been instructed on the "beyond a reasonable doubt" standard, in appellant's presence, and appellant was again present when the jury rendered its verdict and was polled. Appellant had been absent at other points during the trial and during the jury's deliberations when the judge gave some administrative instructions, so there is no reason to suppose, as appellant argues, that the jury would have thought that appellant had escaped or been restrained for disruptive conduct, or would have noticed appellant's absence for any other reason.[19]

Finally, appellant was present the evening before the reinstruction, heard the trial judge's intention to reinstruct on all three issues the next morning, and had ample opportunity to assist his counsel in any strategic response to the request for reinstruction. Especially in light of defense counsel's express refusal to object, stated in appellant's presence, it is difficult for us to fathom what more appellant himself could have done the next morning, in the absence of any suggestion on appeal that the reflection of one night somehow brought to mind some new ground of objection. None is even suggested now. There is thus no reason for us to believe that appellant "enjoyed knowledge superior to or different from that of his counsel," *Harris, supra*, 489 A.2d at 468, or that his "personal presence would ... have aided his defense." *Id.* at 467–68. Such is particularly not the case here, where experienced defense counsel unhesitatingly waived his client's presence at a part of the proceeding where the client would have played no active role, a decision which strongly suggests that any prejudice would be purely theoretical in nature.

*Affirmed.*

---

**19.** Thus, the fact that appellant was also being tried on a failure to appear count, *see supra* note 2, is not particularly significant. Moreover, appellant's own counsel could have easily obviated any such concern by alerting the trial court to its oversight in failing to explain appellant's absence.